792 So.2d 146 (2001)
STATE of Louisiana
v.
Ronny WHITE.
No. 01-KA-134.
Court of Appeal of Louisiana, Fifth Circuit.
July 30, 2001.
*148 Harry J. Morel, Jr., District Attorney, Kim K. McEwee, Assistant District Attorney, Hahnville, LA, Counsel for State.
Bertha M. Hillman, Hillman Law Firm, Thibodaux, LA, Counsel for defendant-appellant.
Court composed of Judges EDWARD A. DUFRESNE, Jr., SOL GOTHARD and CLARENCE E. McMANUS.
McMANUS, Judge.
In this matter, Defendant Ronny White appeals his conviction and sentence for armed robbery. Finding no merit to either of White's assignments of error, and having found no patent error, we affirm the conviction and sentence.

STATEMENT OF THE CASE
On September 27, 1999, Ronny White[1] was indicted for the September 9, 1999, armed robbery of the Hibernia National Bank in Norco, Louisiana. LSA 14:64. The bill was amended on May 9, 2000, to add the name of the individual employee of the bank who was robbed. Defendant entered a plea of not guilty on May 11, 2000.
On October 5, 1999, Defendant moved for a sanity hearing. The hearing was conducted on November 3, 1999, and the Defendant was found sane and competent to stand trial.
On May 31, 2000, following a two-day trial, a 12 person jury found the Defendant guilty as charged, by a vote of 11 to 1.
On June 6, 2000, White filed a motion for post verdict judgment of acquittal and a motion for a new trial. The motion for a new trial was grounded upon a Batson claim. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Both post trial motions were denied on July 24, 2000.
*149 On July 2, 2000, the court ordered a pre-sentence investigation.
A sentencing hearing was held August 15, 2000, during which testimony in mitigation was taken. Aided by the testimony and a pre-sentence report, the judge sentenced the Defendant to imprisonment for 49½ years in the Department of Corrections, with credit for time served, but without benefit of parole, probation or suspension of sentence.
Defendant filed a motion for reconsideration of sentence on August 7, 2000. The motion was denied August 21, 2000.
Defendant filed a motion for appeal on August 17, 2000, which was granted November 21, 2000.

FACTS
On September 9, 1999, at approximately 9:30 a.m., Ronny White and Bryan Loper asked Charles Holmes to go for a ride with them in Loper's girlfriend's white Toyota 4 Runner. While riding, they passed the Hibernia Bank in Norco several times before parking at a location which was two to three blocks away from the bank. White and Loper exited the vehicle and they told Holmes that they would return shortly. At the time, White was wearing a blue and white stripped shirt and blue pants. Loper had on a long-sleeved shirt and blue pants. Each man wore a cap.
On that day, at approximately 10:15 a.m., Scott Adams was working as the branch manager at the Hibernia Bank in Norco. He noticed two black men enter the bank through the front door. The men each brandished a gun and demanded money. One man had a revolver and the other an automatic weapon. Both men had on ski masks, baseball caps and sunglasses. The man in the blue and white striped shirt had on white garden gloves. This gunman was later described as being approximately 6' to 6' 2" and stocky.
The gunmen ordered the bank employees to get down on the floor. As the central teller descended to the floor, she set off the bank's alarm. The assailant in the striped shirt went behind the counter and removed money from one of the teller's drawers. He demanded more money. The branch manager, Scott Adams, opened two more teller drawers and the money was taken. Adams estimated that the amount of money taken was $36,000.00. The gunmen ran out the front door and through an open field located next to the bank and between St. Charles Street and Goodhope Street.
As the gunmen ran from the bank, they were observed by an employee and customer of the Dollar General Store, located across the street from the bank. The employee, Donna Victor, heard a bomb-like sound and saw red powder. One suspect dropped the bag when the dye bomb exploded and the other suspect ran to retrieve it. Ms. Victor called 911.
When the two assailants returned to the 4 Runner, Holmes saw the red dye and asked what had happened. White told him that he and Loper had just robbed the bank. White had changed clothes. Loper removed his long-sleeved shirt to reveal a T-shirt. Loper got into the front driver's seat and White sat behind him in the vehicle. They drove off headed to Holmes's house to drop him off.
A delivery worker, Lynn Dufrene, was working between Goodhope and Apple Streets, on River Road, on that day. She saw two men run out of a field and get into a white Toyota 4 Runner, which was parked on the sidewalk. One of the men was wearing white gloves. Ms. Dufrene pulled into the bank's lot, saw the sign in the bank, and knew there had been a robbery. She told a policeman, in the *150 bank's parking lot, what she had seen. He radioed the dispatcher with a description of the men and the vehicle.
Within five minutes of the radio broadcast, Lt. Edward Nowell of the St. John the Baptist Sheriff's Office spotted the white 4 Runner with the black male occupants traveling on Highway 61 towards the St. Charles Parish line. The vehicle was stopped and the three black male occupants were removed, arrested and placed in two police cars.
Scott Adams, the bank manager, was transported to the scene where the vehicle was located. He looked in the vehicle and was able to identify the striped shirt and a baseball cap.
The vehicle was inventoried by crime scene technician, Sgt. Billy LeBlanc, of the St. Charles Sheriff's Office. He removed a Smith and Wesson, Model 15.38 special, with 6 rounds of live ammunition from the floor of the vehicle. He also removed a Lorcin Model L. 9mm semiautomatic, with 13 rounds of live ammunition from the floor of the 4 Runner. Clothing removed from the vehicle included a white T-shirt, a striped shirt stained with red dye, a long-sleeved white shirt, sunglasses, two baseball caps, a camouflaged mask and garden gloves. Documents and credit cards bearing the names of Ronny White and Bryan Loper were also removed from the interior of the vehicle. The vehicle contained red dye on the left door handle. The vehicle was photographed and dusted for prints.[2] Money was recovered in an area covered with red dye located in the vacant lot to the east of the bank.

ASSIGNMENT OF ERROR NUMBER ONE
As his first assignment of error, Defendant maintains that the trial court erred in failing to grant his Batson challenge regarding Louis Coleman.
Defendant contends that the facts establish a pattern of discrimination by the State in its exercise of peremptory challenges in the selection of the petit jury.
Specifically, Defendant contends that the trial court erred in finding the State presented race-neutral reasons for the exercise of its challenges. He further contends the trial court erred in refusing to grant his Batson challenge to potential juror, Louis Coleman. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
The State argues that the Defendant failed to present a prima facie case of discrimination. In the alternative, the State claims that it provided race-neutral reasons for the challenges it exercised, and, therefore, the trial court correctly denied defendant's Batson challenge.
The right to a trial by jury in criminal cases is such a fundamental feature of the American justice system that it is protected against state action by the Due Process Clause of the Fourteenth Amendment. Batson v. Kentucky, 476 U.S. at 79, 87, 106 S.Ct. 1712. Although a defendant does not have a right to a petit jury composed in whole or in part of persons of his own race, he does have the right to be tried by a jury whose members are selected pursuant to non-discriminatory criteria. Batson v. Kentucky, 476 U.S. at 79, 86, 106 S.Ct. 1712.
Therefore, although a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his view concerning the outcome of the case to be tried, the Equal Protection Clause forbids the prosecutor to challenge potential *151 jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant. Batson v. Kentucky, 476 U.S. at 79, 89, 106 S.Ct. 1712.
In State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272, 278, the Louisiana Supreme Court discussed the three-step test required to prove a Batson claim:
First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the juror in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.
In this case, the racial composition of the general venire is unknown from the record. Likewise, the record does not clearly establish the racial composition of the petit jury in this case. The record does establish that the State exercised peremptory challenges against four persons who were known to be black: John Grimes, Alandra Anderson, Louis Coleman, and Barbara Smith. The State also exercised a peremptory challenge against one person whose race could not be identified (without directly asking), i.e., Pernoll Dinvaut.
The State's first peremptory challenge was exercised against Pernoll Dinvaut. At the time of the challenge, the Defendant commented that this potential juror was black. However, the court made a finding that Dinvaut did not "appear to be" black. Out of an abundance of caution, the State recited, for the record, its race-neutral grounds for exclusion. The State said that Mr. Dinvaut was excluded because he acknowledged that he would have serious reservations in accepting the testimony of former Co-Defendant and State's witness, Charles Holmes. The State also rejected Mr. Dinvaut because the prosecutor did not believe his truthfulness on voir dire.
The State's next peremptory challenge was exercised against John Grimes. The Defendant noted for the record that Grimes was a black male. In addressing the State, the court advised, "It's probably best that you state your reasons." The State said that John Grimes was excluded because his mind was made up that he would not accept the testimony to be given by former Co Defendant and State witness Charles Holmes. The court sustained the peremptory challenge.
Alandra Anderson was the third juror challenged peremptorily by the State. The Defendant noted that Ms. Anderson was a black female. Defendant next stated that the State had exercised three peremptory challenges and they were all against blacks. The court corrected that statement and noted that only two of the challenged jurors were black.
In giving the race-neutral reasons for the exclusion of Ms. Anderson, the State noted that Ms. Anderson showed disrespect for the court by wearing a hat and it was also recognized that she was the only potential juror with a tattoo. The prosecutor further explained that Ms. Anderson had expressed a long-standing religious belief that she could not judge people. According to the prosecutor, Ms. Anderson reluctantly admitted that she could find Defendant guilty if the evidence suggested it; however, the prosecutor did not believe her. Finally, the prosecutor stated that Ms. Anderson admitted reading a newspaper article about the robbery, but she stated that it occurred in March, which made her appear untruthful to the State. The court also noted that this potential juror *152 felt her brother had been wrongfully convicted of armed robbery. The trial court granted the challenge.
The State exercised a peremptory challenge against Louis Coleman. The Defendant stated that Mr. Coleman was a black male and asked for the State's race-neutral reasons for exclusion.
The State responded that Mr. Coleman had expressed hesitation regarding a deal struck between the State and former Co Defendant and State's witness, Charles Holmes. Mr. Coleman said he would need to hear Mr. Holmes's background and this information was not going to be provided at trial.
The court granted the peremptory challenge.
On appeal, the Defendant specifically complains about the exclusion of potential juror Louis Coleman. He argues that since Mr. Coleman indicated that he could be open-minded in listening to State's witness Charles Holmes, there was no reason for his exclusion.
The State indicated that Mr. Coleman had expressed hesitation regarding the deal struck between the State and former Co Defendant Charles Holmes. It is apparent that the State did not believe Mr. Coleman when he stated that he thought he could be open minded in dealing with the testimony of Charles Holmes. Moreover, Mr. Coleman indicated that he would need to hear the background of this witness and the State indicated that this information was not going to be provided at trial. Under these circumstances the trial court correctly sustained the State's peremptory challenge to Louis Coleman.
Finally, the State exercised a peremptory challenge against Barbara Smith. The Defendant commented that she was a black female and that the State was "clearly establishing a pattern." As the race-neutral reasons for exclusion, the State found Ms. Smith had great doubts about State witness Charles Holmes and the deal he entered with the State. Furthermore, she said she would need to see Holmes's school records and these were not going to be produced. Additionally, when questioned about the burden of proof needed to find the Defendant guilty, this juror kept shaking her head no. Therefore, the State felt she was already in line with the defense.
The State initially contends that the trial court ruling was correct because the Defendant failed to establish a prima facie case of discrimination.
The Defendant may satisfy the initial burden of establishing a prima facie case by offering any relevant facts on the issue, including, but not limited to, a pattern of strikes, statements or actions which support an inference of impermissible motivation, the composition of the jury finally impaneled, and any other facts which show a disparate impact on the alleged victim class. State v. Green, supra, at 288. Our review of the record indicates that the Defendant merely noted each time a black person was the subject of a peremptory challenge and commented once that a pattern of discrimination was being established. Though Defendant's statements would marginally satisfy this burden, we also note that the trial court did not rule on whether the Defendant met his burden to establish a prima facie case.
A similar situation occurred in State v. Green, supra. In Green, 655 So.2d at 288, the Louisiana Supreme Court stated:
We agree with the court of appeal that a trial judge's demand that a prosecutor justify his use of peremptory strikes is tantamount to a finding that the defense has produced enough evidence to support an inference of discriminatory *153 purpose. In any case, once a prosecutor has offered a race neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot. (citation deleted).
Under these circumstances we now look at the second step of the Batson analysis and find that the State gave race-neutral reasons for each of his challenges. Unless discriminatory intent is inherent in the prosecutor's explanation, the reason offered is deemed to be race-neutral. State v. Touissant, 98-1214 (La.App. 5 Cir. 5/19/99), 734 So.2d 961, writ denied, 99-K-1789, 750 So.2d 980 (La.11/24/99), citing State v. Green, supra, at 289. None of the reasons for exclusion expressed by the prosecutor indicated a discriminatory intent, rather they were directed at effective trial strategy.
During the third step of the Batson analysis, the inquiry for the trial court is whether the defendant's proof, when weighed against the prosecutor's "race-neutral" reasons, is strong enough to persuade the trier of fact that such discriminatory intent is present. State v. Green, supra, at 290.
In this case the trial court found that the Defendant's proof was not strong enough, when weighed against the prosecutor's race-neutral reasons to convince the court that the prosecutor was acting with a discriminatory intent in the exercise of his peremptory exceptions.
Whether there has been intentional racial discrimination is a question of fact. State v. Tyler, 97-0338 (La.9/9/98), 723 So.2d 939, 942, cert. denied, 526 U.S. 1073, 119 S.Ct. 1472, 143 L.Ed.2d 556 (1999), reh'g denied, 526 U.S. 1166, 119 S.Ct. 2066, 144 L.Ed.2d 230 (1999). A reviewing court should afford great deference to the trial judge's evaluation of discriminatory intent and should not reverse unless the evaluation is erroneous. Id. at 942.
We find that the trial court's actions in sustaining the State's peremptory challenges against the named jurors were correct. It is apparent from the race-neutral reasons supplied by the State that its actions were motivated by trial strategy and not racial discrimination.
This assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER TWO
As his second assignment of error, Defendant argues that the trial court committed error in imposing a constitutionally excessive sentence. Defendant contends that the court did not give adequate consideration to the total sentencing guidelines in particularizing the sentence. He alleges that there were sufficient mitigating circumstances to warrant a lesser sentence and that the aggravating circumstances did not warrant imposition of a sentence of 49½ years.
The State counters that the trial judge has wide discretion in sentencing and the Defendant failed to prove abuse of discretion.
A motion for reconsideration of sentence was filed August 7, 2000, wherein Defendant alleged that his sentence was excessive.
A sentence is excessive and in violation of the Louisiana Constitution if the sentence is grossly out of proportion to the severity of the offense or nothing more than a needless and purposeless imposition of pain and suffering. La. Const. of 1974, art. I, § 20. State v. Bonanno, 384 So.2d *154 355 (La.1980). A sentence is grossly disproportionate to the severity of the offense, if, when the crime and punishment are considered in light of the harm done to society, it is so disproportionate as to shock the sense of justice. Id.
In determining whether a sentence is excessive, the test imposed on the reviewing court is two-pronged. First, the record must show that the trial court took cognizance of the sentencing guidelines set forth in LSA-C.Cr.P. art. 894.1. State v. Smith, 433 So.2d 688, 698 (La.1983); State v. Sepulvado, 367 So.2d 762, 769 (La.1979). While the trial court need not articulate every aggravating and mitigating circumstance outlined in the sentencing guidelines, the record must reflect that the court adequately considered those guidelines in particularizing the sentence to the defendant. State v. Nealy, 450 So.2d 634, 640 (La.1984). The articulation of the factual basis for a sentence is the goal of LSA C.Cr.P. art. 894.1; hence, there need not be rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary, even though there has not been full compliance with the statute. State v. Lanclos, 419 So.2d 475, 478 (La.1982). Important elements, which should be considered, are the defendant's personal history, prior criminal record, seriousness of the offense and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049, 1051 (La.1981).
After determining whether the provisions of LSA-C.Cr.P. art. 894.1 have been complied with by the trial court, the reviewing court must then determine whether the sentence imposed is too severe given the circumstance of the case and the background of the defendant.
The sentencing court is given wide discretion in imposing a sentence within the statutory limits and such a sentence should not be set aside as excessive in the absence of a manifest abuse of discretion by the sentencing court. State v. Square, 433 So.2d 104, 110 (La.1983); State v. Lanclos, supra.
The sentencing range statutorily prescribed for the offense of armed robbery is imprisonment, at hard labor, without benefit of parole, probation or suspension of sentence for not less than ten nor more than 99 years. LSA R.S. 14:64. In this case the court sentenced the Defendant to imprisonment in the Department of Corrections for 49½ years, without benefit of parole, probation or suspension of sentence but with credit for time served.
The trial court, in this case, ordered a pre-sentence investigation report and heard testimony from three witnesses in mitigation before imposing sentence.
The Defendant's mother, Debra White, testified. She stated that she had raised three children as a single parent. Her son, Ronny, was the youngest. His father was killed in an automobile accident when the Defendant was a baby. She stated that the Defendant dropped out of school when he was in the third grade because he was a slow learner. She also testified that Ronny was the father of two beautiful children, ages 2 and 3.
The Defendant's brother, Clarence Jefferson, also testified. He stated that he and the Defendant had parted for a couple of years, but were now back together. He advised the court that the Defendant's entire family was in the courtroom.
Brenda Bush testified that Ronny was her nephew. She stated that he was a sweet person and that since she has known him, he has never been violent.
In sentencing the Defendant, the trial court gave extensive reasons. The judge *155 stated for the record that he was considering the information in the pre-sentence report including the victims' statements and family statements. He also considered the trial testimony and documents, as well as psychological reports and medical reports of the Defendant.
In general, the judge stated that he felt that the Defendant needed a custodial environment and that there was an undue risk that he would commit another crime if not institutionalized. The judge remarked that a lesser sentence would deprecate the seriousness of the offense.
The trial judge enumerated both aggravating and mitigating factors as applied to this Defendant. In particular, the court took into account the fact that the crime was deliberately cruel, as illustrated by the order given by Defendant to the female employees of the bank: "F...... B..... get down on the floor." He also considered that since a sum in excess of $35,000.00 was taken, that this was a major economic offense. The Defendant endangered more than one person. White pointed a loaded gun at the victims; the court noted the use of the gun as an independent aggravating circumstance. The court also took into account the fact that Defendant was on probation at the time of this offense and he had been previously arrested for seven offenses.
In mitigation, the court took into account the fact that the Defendant had a learning disability and was mildly mentally retarded. The court also considered the statements in the pre-sentence report, letters from family and friends.
In summary, the trial judge stressed the fact that he was impressed by the victims' statements regarding how fearful they were that they might be shot during the commission of the crime. Additionally, the judge took into account that the Defendant had no convictions for violent offenses. He was, nonetheless, aware of the Defendant's criminal record, especially an arrest for the crime of accessory to murder. According to the trial judge, the Defendant had had the opportunity to reform since 1995, and had not availed himself of the opportunity.
It is clear from the record that the trial court took into account the sentencing guidelines and he recited the aggravating and mitigating factors for the record. Thus, he particularized the sentence to the offender and the offense. Moreover, in sentencing the Defendant to one-half of the maximum sentence possible for the offense of armed robbery, the trial judge did not abuse his wide discretion. The circumstances of the case clearly justify the sentence imposed.
This assignment of error is likewise without merit.

ERROR PATENT DISCUSSION
The record was reviewed for errors patent, according to LSA C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). The review reveals no errors patent in this case.
Therefore, for the above reasons, we affirm both the conviction and sentence herein.
AFFIRMED.
NOTES
[1] White was indicted with Co Defendants Bryan Loper and Charles Holmes. Loper was tried separately. Holmes entered a negotiated plea of guilty.
[2] The camera broke and these photos were lost. No identifiable prints were found.