844 So.2d 217 (2003)
STATE of Louisiana
v.
Maher A. FARHOOD.
No. 02-KA-490.
Court of Appeal of Louisiana, Fifth Circuit.
March 25, 2003.
*220 Paul D. Connick, Jr., District Attorney, Thomas J. Butler, Terry M. Boudreaux, Kia M. Habisreitinger, Lisa B. Schneider, Assistant District Attorneys, Gretna, LA, for Plaintiff/Appellee.
Jack M. Capella, Metairie, LA, for Defendant/Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, SOL GOTHARD, and CLARENCE E. McMANUS.
SOL GOTHARD, Judge.
In this criminal appeal defendant, Maher Farhood, appeals his conviction and sentence on a guilty verdict of attempted manslaughter. For reasons that follow, we affirm.
Farhood was charged by bill of information with attempted murder of his wife. He was arraigned and pled not guilty. After a trial on the merits, the jury returned a verdict of guilty of attempted manslaughter. Before sentencing defendant, the trial court conducted a hearing at which it heard testimony from victim impact and defense witnesses. Following the hearing, the court imposed a sentence of twenty years at hard labor with credit for time served. The sentence was ordered to run consecutively with the sentence imposed on defendant for a prior conviction of simple battery. Subsequently, defendant filed a motion to re-consider sentence that was denied by the court. Additionally, defendant made an oral motion for appeal that was followed by a written motion. The trial court granted the motion and this appeal followed.
FACTS
On the afternoon of August 22, 1999, Barbara Guidry heard a knock at her door. She opened her front door to find her neighbor, Maha Farhood, collapsed on the doorstep. Ms. Farhood told Ms. Guidry that defendant had beaten her and then she collapsed again. Ms. Guidry was able to get Ms. Farhood into the apartment. When Ms. Farhood was revived, she asked Ms. Guidry to call a family member, and Ms. Guidry did so. Ms. Guidry held the *221 phone to Ms. Farhood's ear and heard Ms. Farhood say, "He beat me." "He beat the s___out of me." "He's going to kill me." After this call, Ms. Guidry called 911 for emergency assistance.
Deputy Robert Long of the Jefferson Parish Sheriff's Office was dispatched to answer the 911 call. Deputy Long found the victim on a stretcher and she appeared to have been severely beaten. The victim's face and neck were red, her eyes were swollen shut, and there was blood flowing from her left ear. She was stabilized and then transported to East Jefferson General Hospital for treatment.
Deputy Long examined the Farhoods' apartment and it appeared to be ransacked. There were blood splatters on sheets in a child's bedroom, on the doorframe outside the master bedroom, and in the hallway. A clump of brown hair was found next to a bed. Thereafter, the officer went to the hospital where he met with the victim and had photographs of her injuries taken.
Richard Broussard, a detective with the Jefferson Parish Sheriff's Office, was assigned to this case on August 27, 1999. Detective Broussard met with Ms. Farhood in the hospital on August 30, 1999, prior to her release. After the interview, Detective Broussard secured an arrest warrant for Maher Farhood. He unsuccessfully sought to execute the warrant against the defendant at the defendant's apartment and at the home of defendant's brother. The defendant, who had been at large, surrendered to Detective Broussard on February 3, 2000.
Maher Farhood denied attacking his wife, but indicated that she used to attack him by slapping and scratching him, and that he would push her away. He said that the victim resented his close association with his family members. He denied placing his hands on her in anger when she was pregnant.
Ms. Farhood gave a different account of the causes of her injuries. She stated that on Sunday, August 22, 1999, defendant told her that she had to drive him to the grocery where he worked near the St. Bernard Housing Project. The victim told her husband that she would first have to get dressed, and she went to the couple's bedroom to change clothes. Defendant became impatient and was trying to hurry his wife. When she returned from the bedroom to the living room to put on her shoes, defendant was yelling at her and he pulled her towards him, tearing her new blouse. The victim was crying and she walked to the bedroom again to change her clothes. Defendant began to throw objects around the apartment in a show of anger. Ms. Farhood dropped to the floor but soon got up and went into her son's playroom for safety. Defendant followed his wife into the room and commanded her to hurry up and stop "playing games." Defendant then grabbed his wife and began to hit her in the head with his fists. He struck her head against the wall about fifteen times in succession. Thereafter, he repeatedly banged her head against the television. The victim was on the floor in pain and crying, as her husband stood over her hitting her in the face and head, and yelling for her to shut up.
As a result of the attack, the victim was crying and dizzy, and her vision was blurred. After a while, she was able to stand up, but when she looked into the mirror she could not focus her eyes. Ms. Farhood thought her husband had left, as was his habit after such incidents. She made her way to the living room, propped herself up against the wall, and attempted to use the phone to call for help. Ms. Farhood stated that her head was throbbing and her ear hurt when she pressed *222 the phone against it. At that moment, Maher entered the room and saw his wife using the phone. He snatched the phone from her hand, threw it across the room and yelled that he was not going to jail for her.
Defendant then pulled his wife by her hair through the hallway and into their son's room. She fell on the child's bed, screaming and crying in pain. There was a window adjacent to the bed and she thought of trying to escape. Before she could make any attempt to escape, her husband pushed her against the wall and put his hand on her chest and then around her throat. Defendant kept yelling at her that he was not going to jail for her and he progressively tightened his grip around her neck. Her pleas and crying began to fade. Defendant picked her up off the floor by her throat and Ms. Farhood stated she could feel her eyes bulge. She felt like she was going to die and she passed out. When she returned to consciousness, Ms. Farhood managed to get to her knees. She could not see, her head was heavy and there was an echo in her ears. She appeared to be alone in the apartment. She crawled on her hands and knees to the front door and struggled to move out onto the balcony. Her husband's parking place appeared to be vacant, so she crawled to her neighbor's apartment and beat on the door.
Upon her arrival at East Jefferson, the victim was initially placed in I.C.U. She underwent a series of tests and examinations and stayed hospitalized for twelve days. During her stay in the hospital, an ophthalmologist, Dr. Robert Shemik, and a neurosurgeon, Dr. Juan Pisarello, examined Ms. Farhood.
Dr. Shemik saw Ms. Farhood in I.C.U. He found her to be essentially blind, in that her vision in both eyes was limited to light perception and possible hand motion realization directly in front of her eyes. She had organic visual loss due to damage to the optic nerve caused by strangulation. According to Dr. Shemik, the injuries were compatible with strangulation and the strangulation caused occlusion to the circulation to the head and obstructed the blood flow to the nerve path, causing severe edema behind the eyes and damaging the nerve path.
During her hospital stay, the vision in the victim's right eye improved rapidly, while that of the left eye was slower. She had also experienced hemorrhaging to the sclera of the eye and the face.
Dr. Juan Pisarello found the victim to be frightened and very upset. Dr. Pisarello noted that there was no apparent motor or sensory deficient or neurological deficit during his physical exam. However, an MRI and SPET evidenced neurological damage at the left side of the brain and in the base of the frontal lobe. According to Dr. Pisarello, these areas of the brain were not receiving blood flow. Dr. Pisarello found damage to the cortex of the brain and surrounding areas. It was his opinion that, at the time of the assault, the circulation to the brain was interrupted to the point of actual brain damage.
After hearing the testimony and following deliberations, the jury convicted the defendant of attempted manslaughter.
LAW
In seven assignments of error, defendant argues his conviction and sentence should be reversed. The first assignment relates to jury instructions. Defendant asserts that the failure of the trial court to provide the jury with defense proposed jury instructions violated appellant's Louisiana and federal constitutional rights. This assignment is sub-divided into three parts.
*223 Defendant first argues that the trial court erred in failing to give an instruction on second-degree battery. He reasons that if the jury believed the defendant was only guilty of second-degree battery, they would find him not guilty of the charged offense. Defendant concedes that he was allowed to read the law on second-degree battery to the jury during closing. Nonetheless, he alleges that he was prejudiced by the trial court's action. He contends that reading the law to the jury does not carry the same weight as a judge's instruction.
The State replies that the trial judge correctly denied the special jury charge on second-degree battery because second-degree battery is not a responsive verdict to attempted second-degree murder. Alternatively, the State contends that the defendant suffered no prejudice because the trial judge permitted defense counsel to read the elements of second-degree battery to the jury.
The court shall charge the jury "as to the law applicable to the case." LSA-C.Cr.P. art. 802(1). The State and the defendant shall have the right to submit special jury charges. The court shall give a requested special jury charge, "if it does not require qualification, limitation or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given." LSA-C.Cr.P. art. 807. "When a count of the indictment sets forth an offense which includes other offenses of which the accused could be found guilty under the provisions of Article 814 or 815, the court shall charge the jury as to the law applicable to each offense." LSA-C.Cr.P. art. 803.
A list of enumerated responsive verdicts is set forth in LSA-C.Cr.P. art. 814, which provides, in pertinent part as follows:
A. The only responsive verdicts that may be rendered when the indictment charges the following offenses are:
. . . .
4. Attempted Second-Degree Murder:
Guilty.
Guilty of attempted manslaughter.
Guilty of aggravated battery.
Not guilty.

. . . .
The Louisiana Supreme Court has consistently held that when responsive verdicts are mandated by LSA-C.Cr.P. art. 814, the trial court is without authority to add to the prescribed verdicts. State v. Square, 433 So.2d 104, 109 (La.1983).
In this case, the trial judge gave the jury the following instruction concerning responsive verdicts in this case:
Therefore, one of the following verdicts may be returned:
1) Guilty of attempted second-degree Murder.
2) Guilty of attempted manslaughter.
3) Guilty of aggravated battery.
4) Not guilty.
The defendant filed a proposed jury charge wherein he quoted from LSA-R.S.14.34.1, giving the definition and penalty for second-degree battery. With regard to the defendant's request for an instruction on second-degree battery, the trial court judge stated the following:
THE COURT:
The other proposed defense jury instruction would be that the court include the definition of Second-degree Battery in the jury charge. And I indicated I would not give the Second-degree Battery [charge] because it is not a responsive verdict. The question now becomes *224 in my mind as to whether or not I will counsel [sic] to argue, unless somebody shows me a case to the contrary and I think the state of the law is that counsel can read the definition of Second-degree Battery and argue from it, but I will not give it in the jury charges themselves. Defendant lodged an objection to the ruling.
Second-degree battery is clearly not a responsive verdict to the charge of attempted second-degree murder. LSA-C.Cr.P. art. 814(4). Nevertheless, in this case the defendant concedes that he was allowed to argue second-degree battery and its elements to the jury. As such, it was not error for the trial court to refuse to give the requested special jury charge under these circumstances. We find this argument to be without merit.
Defendant next argues that the trial court erred in refusing to give a special jury charge on the presumption that may arise from the failure to call a witness. Defendant alleges that the failure of the State to call the emergency room physician, Dr. Creel, created a presumption that this expert's testimony would have been unfavorable to the State. He postulates that Dr. Creel would have testified that the victim's injuries were not life-threatening, thus refuting the State's attempted second-degree murder charge.
The State replies that the trial judge acted correctly because this witness was not under the State's exclusive control, but was equally available to be called by the prosecution or defense. Additionally, the State points out that the defense chose not to call this expert but, rather, chose to rely upon his own expert.
The effects of legal presumptions are set forth in LSA-R.S. 15:432, which provides, in pertinent part, as follows:
A legal presumption relieves him in whose favor it exists from the necessity of any proof; but may nonetheless be destroyed by rebutting evidence; such is the presumption ... that evidence under the control of a party and not produced by him was not produced because it would not have aided him ...
The clear language of the statute indicates that the party against whom the presumption is sought must be in control of the witness and fail to call him, in order for the presumption to arise. See, State in the Interest of J.G., 94-194 (La.App. 5 Cir. 7/26/94), 641 So.2d 633, 636. If the witness is equally available to both sides, the presumption does not arise. State v. Simms, 381 So.2d 472, 476 (La.1980). In such cases, this Court has found that the defendant was not entitled to an instruction on the State's failure to call a witness. State v. Jackson, 527 So.2d 1039, 1043 (La.App. 5 Cir.1988).
In this case, the prosecutor first advised the trial judge in the early stages of the trial that, as a strategic matter, she would not be calling either Dr. Creel or Dr. Ahmad. At the close of the trial, defendant sought a special jury charge under LSA-R.S.15:432. He filed a proposed jury instruction wherein he cited the presumption. The trial court denied that request.
We find that, in this case, the trial judge correctly excluded the special jury charge. He was correct in concluding that an adverse presumption did not arise from the failure of the State to call Dr. Creel, who is a healthcare expert and was equally available to both the prosecution and the defense. According to law, no presumption arose from the State's failure to call him. State v. Simms, supra.
In his final argument in this error assignment, defendant contends that the trial court erred in failing to give a requested *225 special jury instruction on the issue of self-defense. In particular, defendant wanted a jury instruction to the effect that "the State must prove beyond a reasonable doubt that the defendant did not act in self-defense."
The State responds that the requested charge was included in the general charge and constituted a correct statement of the law on self-defense.
We have reviewed the general charge given to the jury and find it to be a correct statement of the law on justification and self-defense as set forth in LSA-R.S.14:18 through R.S. 14:19.[1] The requested jury charge was contained in the general charge; therefore, the trial judge correctly denied the special charge requested by defendant on the issue of self-defense. LSA-C.Cr.P. art. 807.
Accordingly, we find no merit in defendant's first assignment of error.
In the second assignment, defendant asserts that the imposition of the maximum sentence is unconstitutionally excessive in this case. In this case the defendant filed a motion to reconsider sentence, which was denied by the trial court. He argues the motion should have been granted because the facts in this case do not meet the most egregious criteria for imposition of the maximum sentence. Rather, defendant argues he should receive a sentence more in line with the penalty for second-degree battery.
The Eighth Amendment to the United States Constitution and Article I, Section 20 of the Louisiana Constitution prohibit the imposition of cruel or excessive punishment. A sentence is excessive if it is grossly disproportionate to the seriousness of the offense so as to shock our sense of justice, or if it imposes needless and purposeless pain and suffering. State v. Lobato, 603 So.2d 739, 751 (La.1992); State v. Brown, 01-160 (La.App. 5 Cir. 5/30/01), 788 So.2d 667, 674. In reviewing a sentence for excessiveness, this Court must consider the punishment and the crime in light of the harm to society and gauge whether the penalty is so disproportionate as to shock our sense of justice, recognizing at the same time the wide discretion afforded the trial judge in determining and imposing sentence. A sentence within statutory limits will not be set aside as excessive absent manifest abuse of discretion. State v. Lobato, supra, at 751; State v. Bacuzzi, 97-573 (La.App. 5 Cir. 1/27/98), 708 So.2d 1065, 1069. Maximum sentences are reserved for the most serious violations and the worst offenders. State v. Sullivan, 02-35 (La.App. 5 Cir. 4/30/02), 817 So.2d 335.
On appellate review of sentence, the only relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. State v. Soraparu, 97-1027 (La.10/13/97), 703 So.2d 608. In determining whether a sentence is excessive, the test imposed on the reviewing court is two-pronged. First, the record must show that the trial court took *226 cognizance of the sentencing guidelines set forth in LSA-C.Cr.P. art. 894.1. State v. White, 01-134 (La.App. 5 Cir. 7/30/01), 792 So.2d 146, 154. While the trial court need not articulate every aggravating and mitigating circumstance outlined in the sentencing guidelines, the record must reflect that the court adequately considered those guidelines in particularizing the sentence to the defendant. State v. White, supra. The articulation of the factual basis for a sentence is the goal of LSA-C.Cr.P. art. 894.1; hence, there need not be rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary, even though there has not been full compliance with the statute. State v. White, supra.
The sentencing range statutorily prescribed for the offense of attempted manslaughter is between five and twenty years of imprisonment at hard labor. LSA-R.S. 14:27:31. In this case, the defendant was sentenced to the maximum imprisonment of twenty years at hard labor.
The trial judge did not seek a pre-sentence report; however, the court did listen to impact statements by the victim as well as three defense witnesses. The defendant testified and presented five witnesses in mitigation.
Following this testimony, defendant argued that he had no criminal record and the sentence should be probation and possibly some restitution. The prosecutor argued that the defendant showed no remorse and, in fact, showed disrespect for the criminal justice system. The prosecutor stated that the victim will have to live the rest of her life with this experience and she was fortunate to be alive. She also added that it was the worst case of domestic violence she had seen.
In sentencing the defendant, the trial judge stated the following:
THE COURT:
Okay. I'm ready for sentencing. Okay. Mr. Farhood, I want to make it clear so that you understand and everyone understands that the reason we are here are for no one's actions other than Mr. Farhood's. But for his actions, we would not be having this meeting today, we would not have had a trial. So his actions brought us here.
I have to say, at least today, at least in hearing your words I'm glad that the word remorse was brought out. Because I have to say this, that your attitude during the trial and your demeanor during the trial, there was anything but any type of remorse shown, and that's what we tell jurors to take into account the demeanor of a person, and your demeanor during the trial was, if anything else, it had nothing to do with remorse. It had to do with apparent arrogance. So, I'm glad at least you have admitted that you were in fact wrong and did hurt your wife.
You were twice as big as she was at the time, more than twice as big. She was 115 pounds. You were anywhere from 250 to 265 pounds. But when it came to courage she was probably ten times as courageous as you were. Your strength was just incredible, and you were almost in that position, I remember Mr. Netterville standing about right there and you stepped down from the witness stand to show him how the incident occurred with you and your wife, and you grabbed his arm with your left hand like he was thrusting a knife, and then you reached up and grabbed his throat, and I wish I had a camera to show the picture of you and Mr. Netterville there and the surprise on Mr. Netterville's face when you did that, and he's a lot bigger than your wife was, and with the ease with which you pushed *227 him into the jury box almost. And the jurors even jumped back. So you're a very strong man.
I believe the evidence showed at the trial that you at the time intended to kill your wife. The district attorney, in making an argument, indicated that you got a break when she didn't die. You got a break when the jury found you guilty of a lesser charge.
You left her for dead. You left her for dead. You strangled her. You left her there to die. You didn't call 911. You didn't see if you could help. You didn't do anything else.
You went away, and then I heard today, as one of the arguments your counsel made, you ran away to another state because of threats. Then, as soon as you felt it was safe for you, you came back. She was there needing assistance. She could have died. She was blinded for a while. There may be permanent brain damage. This was a woman you say you loved. I don't fault you that. Maybe you do. The problem is the acts that you performed, the callousness with which you treated her. You talked about the good times. I'm not saying that you didn't have good times. I'm sure you did. I'm sure you had lots of good times. But the seriousness of your actions have to bring about a serious sentence.
You hit her. You beat her. I convicted you of a prior battery on her. You went through all of the formalities of going back to Israel and having some type of conference with respected leaders from your community so that it would never happen again, and then when it happened again it blew up and how she didn't die, but for the incredible courage and fortitude of this little bitty slip of a person, we would be dealing with a murder. And I think that's been lost here. And I'm not saying that when you're out in the world you're not kind to people, you don't give money to charity, that you don't help people in your community. But what you did on that day deserves a serious sentence.
I've considered all of the sentencing guidelines of Article 894.1 of the Code of Criminal Procedure. I believe that any lesser sentence than I'm going to give you would deprecate the seriousness of your crime because this is a serious, serious crime, and it demands only one sentence and that sentence is twenty years hard labor with credit for time....
The trial judge complied with the requirements of the sentencing guidelines by taking into account both mitigating and aggravating circumstances. He listened to the numerous witnesses presented by defendant in mitigation. He specifically mentioned that the defendant had now indicated some sense of remorse. However, he was aware of the severe injuries suffered by the victim, including temporary blindness and brain damage, at the hands of her husband who was twice her size. He was particularly impressed with the defendant's callousness in beating her nearly to death and leaving her alone to die. For these reasons, the seriousness and callousness of the crime, in his opinion warranted a serious sentence. He specifically stated that a lesser sentence would deprecate the seriousness of the offense.
The trial judge adequately complied with the sentencing guidelines set forth in LSA-C.Cr.P. art. 894.1 and particularized the sentence to the offense and the offender. We find no abuse of discretion in the imposition of the maximum sentence in this case. Accordingly, we find no merit in this assignment.
In the third assignment, defendant alleges the trial court erred in denying *228 appellant "good time." As the State correctly argues, the record does not support defendant's contention. A review of the sentencing transcript indicates the trial court did not give a directive regarding "good time." The court stated that it would not make a recommendation and would leave that decision up to the Department of Corrections. Further, the commitment places no restriction on "good time." Therefore there is no restriction set by the court on good time. For these reasons, this assignment of error is without merit.
In his next assignment of error, defendant argues the trial court erred in allowing evidence of other crimes. As the record shows, in addition to the felony charge of attempted murder that is the focus of this appeal, defendant also had a charge pending for simple battery resulting from a prior domestic altercation in which he struck his wife repeatedly and caused contusions to her right eye and arm. The trial on that charge was conducted by the bench one day before the jury trial in the attempted second-degree murder charge. The defendant was found guilty as charged of simple battery. On that same day, the court considered a pleading filed by the State showing its intent to introduce evidence of other, similar crimes, including the conviction in the simple battery case, in the attempted second-degree murder case. The pleading also sought to introduce, "testimony of the victim, family members, any investigating and/or arresting officers, police reports, medical records, photographs and any and all corroborating evidence that can be gathered before trial of the said crimes."
Defendant complains that the court allowed evidence of bad character in violation of law. He asserts the State failed to demonstrate system, motive or intent for purposes of admission of other crimes evidence. Specifically, defendant cites the following evidence:
1) That between August 22, 1994 and October 5, 1998, Maher stated that if Maha ever had him arrested he would kill her.
2) That after watching a news show regarding a husband who killed his wife after she divorced him, that Maher stated he "admired" men that killed their wives.
3) Evidence of the misdemeanor conviction for simple battery.
4) That on numerous occasions Maher slapped, kicked and punched Maha, to the point of a fractured toe, sprained fingers and multiple bruises.
The State argues that the two statements were threats admissible pursuant to LSA-C.E. art. 404(B) to prove motive and intent, and the absence of mistake or accident in connection with the attempted murder. Further, the State asserts the statements are probative of a genuine issue in question regarding the defendant's self-defense claim. The State defends the admission of the acts of violence for the same reasons. The State also argues that the incidents prove intent, an essential element of the charge crime, because they involve the same person, pattern, and modus operandi.
Generally, evidence of other crimes is inadmissible because there is a risk the defendant will be convicted because he is viewed as a "bad person" and because of confusion such collateral issues may cause for the jury. State v. Humphrey, 99-838 (La.App. 5 Cir. 4/29/97), 694 So.2d 1082, 1084, writ denied, 97-1461 (La.11/7/97), 703 So.2d 35. There are, however, statutory and jurisprudential exceptions for use of "other crimes" evidence.
*229 The admissibility of evidence concerning other crimes, wrongs or acts of the defendant is primarily controlled by LSA-C.E. art. 404, which provides in pertinent part, as follows:
LSA-C.E. Art. 404. Character evidence generally not admissible in civil or criminal trial to prove conduct; exceptions; other criminal acts.
B. OTHER CRIMES, WRONGS, OR ACTS. (1) Except as provided in Article 412 (Rape Shield Provision), evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
In State v. Humphrey, supra, 694 So.2d at 1085, this Court stated:
Furthermore, the State must show that the evidence is necessary to prove a matter genuinely at issue, that there is clear and convincing proof that the accused committed the other crime and that the probative value of the evidence of the other crime outweighs its prejudicial effect.
(Citations omitted)
The record indicates that the State filed two Notices of Intent to Use Other Crimes Evidence. The first notice was filed on April 4, 2000 and it indicated that, on October 5, 1998, defendant threatened and struck his wife, and that this incident was reported to the Jefferson Parish Sheriff's Office. The notice further indicated that the State sought to use this evidence at trial to establish "intent, preparation, plan and absence of mistake or accident." On March 19, 2001, a second notice was filed by the State wherein it enumerated seven specific statements it attributed to the defendant and indicated that the prosecution sought to introduce these statements at trial.
The pre-trial hearing on the admissibility of the "other crimes" evidence was held on March 19, 2001. Before the hearing, the court conducted a trial on the simple battery charge stemming from the October 5, 1998 incident and defendant was found guilty as charged. The State asked the trial court to take judicial notice of the testimony in that case for purposes of the Prieur[2] hearing. The defendant objected. The trial judge agreed to take notice of the testimony of abuse, subject to the defendant's rebuttal, at which time the court would allow defendant to present additional evidence.
The State presented the victim, Maha Farhood, for testimony. Ms. Farhood testified that she was married in 1994 and she used this as a reference point. She stated that within about two months of her marriage, her husband physically accosted her. She threatened to call the police and her husband responded that if she had him arrested he would kill her.
The victim also testified that in May or June of 1999, she was watching a television news show, and it was revealed that a man *230 had killed someone and then fled the country. Ms. Farhood testified, that upon hearing this, the defendant stated that if he killed someone he would leave.
Ms. Farhood also relayed the facts surrounding an incident that occurred before October 5, 1998, wherein she was watching a television program in which a man had killed his wife after the couple's divorce. According to this witness, upon seeing this, her husband laughed and commented that the victim "deserved it" and that he admired men who kill their wives.
Ms. Farhood testified that she went to the District Attorney's Office, after the assault she had suffered on October 5, 1998 and filed charges. But, she told the prosecutors that she did not wish to pursue the case because she was afraid of the retaliation by her husband.
Additionally, Ms. Farhood relayed information regarding an incident that occurred when she was five and one-half months pregnant. She stated that at that time she and her husband went to the doctor's office for her ultrasound. The nurse asked if she wanted to know the sex of her unborn child and she declined. Her husband stated that he wanted to know but the nurse would not tell him, noting that his wife was the patient. According to Ms. Farhood, when the couple got home, her husband told her that the next time he wanted her to do something, she better do it. Then, her husband pushed her against the wall, slapped her head against the wall and attempted to choke her.
Ms. Farhood also related an incident that started as an argument and escalated into a beating by her husband wherein she sustained fractured toes and a sprained finger. After that incident she required medical treatment for the injuries. Finally, Ms. Farhood testified that during the marriage her husband had hit her in the face, slapped her, kicked her and had pushed her to the ground. She stated that the defendant had also previously threatened her life.
Subsequently, the defendant took the stand and he individually denied each of the enumerated statements and alleged acts of abuse.
Following the testimony, the State voluntarily struck two of the statements it formerly intended to use at trial. The court found that the two statements of which defendant complains in this appeal were admissible. Further, the court also found the recent simple battery trial and conviction admissible. Finally, the court found the evidence of numerous slaps, punches and threats during the marriage to be admissible, because "[t]hose are the type of things that on a cumulative effect and without being specific are still proper because of the type of crime we're dealing with." The court added that the evidence of fractured toes, sprained finger and choking, were "specific enough and related enough to allow someone to defend and give notice of intent, scheme, knowledge and motive." Other evidence that the State sought to introduce was deemed inadmissible by the court. Following the court's ruling, the defendant lodged objections to the rulings.
The defendant was charged with attempted second-degree murder, by beating and choking his victim. The crime of second-degree murder as defined in LSA-R.S. 14:30.1, reads in pertinent part as follows: "Second-degree murder is the killing of a human being: When the offender has a specific intent to kill or to inflict great bodily harm." Any person who, having the specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishment of the crime is guilty of an attempt to commit the offense intended. *231 LSA-R.S. art. 14:27. State v. Bishop, 34,637 (La.App. 2 Cir. 7/24/01), 792 So.2d 886, 889. As such, specific intent to kill is an essential element of the offense of attempted second-degree murder. Id
In State v. Pardon, 97-248 (La.App. 5 Cir. 10/15/97), 703 So.2d 50, at 58, writ denied, 97-2892 (La.3/20/98), 715 So.2d 1207, this Court, citing from State v. Kahey, 436 So.2d 475, 488 (La.1983), discussed the three prerequisites that must be satisfied before evidence of other crimes is admitted as proof of intent: "(1) the prior acts must be similar, ... (2) there must be a real and genuine contested issue of intent at trial, ... 3) the probative value of the evidence must outweigh its prejudicial effect."
In his prior conviction for simple battery, tried by the same trial judge immediately before the present trial, the testimony indicated that a verbal dispute escalated to a physical attack whereby the defendant pushed his wife against the wall, she fell to floor and was hit in the face and kicked by her husband. The actions are practically identical in manner, if not degree, to those that occurred in the present case. With regard to the other incidents of physical abuse, the trial judge found that they were cumulative. They likewise were similar in nature to the defendant's actions in the present case.
The defense in this case is justification because of self-defense. The defendant's conduct in the prior case and the enumerated incidents of abuse toward this victim were relevant to a material issue in dispute and were probative of his system and intent. The defendant was convicted of the simple battery charge. Additionally, the evidence of the other incidents of physical abuse were adduced at a hearing at which the victim testified subject to cross-examination and the trial judge apparently found the evidence to be credible. Finally, the probative value of the simple battery and similar acts of physical abuse outweighed the prejudicial effect. Under these circumstances, the trial judge correctly found the evidence of the simple battery conviction and the similar acts of physical abuse to be admissible at this trial.
The defendant argues on appeal that the two statements, that he would kill his wife if she had him arrested, and that he admired men who killed their wives, were merely attempts by the prosecution to depict him as a person of bad character.
The State responds that the statements were threats that were admissible to prove motive, intent and absence of mistake or accident. The State also alleges that the evidence of threats would negate the defendant's claim of self-defense.
The same issue was raised in this Court's recent decision in State v. Humphrey, supra. In Humphrey, the victim ended a relationship with the defendant and he continued to try to see the victim. During one such encounter, he was verbally abusive and the verbal abuse involved overt threats of injury and death toward the victim. The violent conduct ultimately culminated in the victim's death. At trial in Humphrey, the State was permitted to introduce statements to prove motive and intent and absence of mistake or accident in connection with the killing. This Court agreed that the threats were admissible and reasoned that the threats were proven by clear and convincing evidence because the testimony was given by an eyewitness to the events. Further, the testimony was probative of a genuine issue in question because the defense had claimed that the killing was an accident. The evidence of threats made by defendant towards the victim was probative of defendant's intent *232 and the absence of mistake or accident. Id. 694 So.2d at 1085-1086.
In the case at bar, one of the statements constituted a threat. Further, both statements were probative of defendant's intent. These statements also negated defendant's allegations of self-defense. Additionally, the probative value outweighed the prejudicial effect. For these reasons, the trial judge acted correctly in admitting the statements into evidence.
In the next assignment, defendant avers the trial court erred by allowing the use of a doll for demonstration purposes during the victim's testimony. The defendant contends that the trial court erred in allowing the victim to use a doll to demonstrate what happened to her. He reasons that the doll was not relevant and that there was no basis for its use, since the victim was not having trouble describing the incident. Defendant argues the use of the doll was premeditated. He further argues that the use of the doll, and a comment made by the victim that she did not want to use this doll, which she had previously purchased, because it was "a pretty doll and I really don't want to ruin her," were calculated to inflame the jury.
The State responds that the doll was not admitted into evidence at trial. The use of the doll bore a rational connection to the facts the State sought to prove, namely, the actions by defendant that comprised the elements of the offense with which he was charged.
During the testimony of the victim, she was questioned at length concerning her husband's attack of August 22, 1999. The victim was asked the following questions:
PROSECUTOR:
Maha, is there anything that would help you in demonstrating to the jury what Maher (defendant) did to you with that T.V.?
WITNESS:
Yes.
PROSECUTOR:
What would that be?
WITNESS:
A doll.
Thereafter, a bench conference ensued. At that time, the prosecutor advised that the doll would be used for demonstrative purposes. The defense asked if the doll was being introduced into evidence and the following discourse occurred:
PROSECUTOR:
No. No. She's having a hard time describing, you know, where his hands were in relation to her head. How it was done. She just wants to demonstrate and show the jury how it was done. We're not introducing the doll in evidence. It's just going to be demonstrative.
DEFENSE:
I disagree she's having a hard time describing it. Because, obviously, it was a planned thing. She just stopped and asked the question. She immediately knew it was a well
PROSECUTOR:
Well, yeah, and I'll bring that
THE COURT:
I'm going to allow her to use it.
Thereafter, the defendant lodged an objection. The following series of questions were asked:
PROSECUTOR:
Okay. When I asked you earlier if there was something that would help you to articulate to the jury and demonstrate to the jury what he did to you, your answer was what? What could we use?
WITNESS:
II said I could use a doll.
*233 PROSECUTOR:
And who came up with the suggestion?
WITNESS:
I did.
PROSECUTOR:
When?
WITNESS:
Last night, and where I was staying I just thought, how could I describe what happened? What would be a good way? And just that's the only thing I can think of that would be closest to a person would be a doll.
PROSECUTOR:
Maha do you recognize this doll?
WITNESS:
Yes, I do.
PROSECUTOR:
Whose doll is this?
WITNESS:
This is my doll, actually.
PROSECUTOR:
When did you get her?
WITNESS:
Actually I just bought her yesterday.
PROSECUTOR:
And why did you buy her?
WITNESS:
Just to demonstrate on her pretty much, and really hate to because she's a really pretty doll, and I really don't want to ruin her.
PROSECUTOR:
Okay. Maha, could you demonstrate to the jury how Maher was beating your head against the TV with that doll?
WITNESS:
Yes, I can.
PROSECUTOR:
Okay. Will you do that now, please?
WITNESS:
Yes, I will take this off of her. I just remember that I was in something of this sort of a position, and this would be the TV, but I'm not going to use it because it will justhe just had his hand on one side and he was just like pounding my head against the TV, just over and over and over and over (Indicating).
Evidence is relevant if it has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable, or less probable, than it would be without the evidence. LSA-C.E. art. 401. Generally, an appellate court places great weight upon a trial court's ruling on the relevancy of evidence and such a determination will not be reversed absent a clear abuse of discretion. State v. Gaal, 01-376 (La.App. 5 Cir. 10/18/01), 800 So.2d 938, 950. Additionally, the use of demonstrative evidence is within the sound discretion of the trial judge and his ruling will not be disturbed on appeal, unless it constitutes an abuse of discretion. State v. Hutchinson, 02-60 (La.App. 5 Cir. 5/15/02), 817 So.2d 500, 507.
The prosecutor admitted that the use of the doll was "premeditated" and, in testimony by the victim, informed the jury that it was the victim's idea to use the doll. This does not diminish the basis for the use of the doll, since the victim testified that she felt it would help her explain this incident to the jury. Moreover, the trial judge apparently found the use of the doll for demonstrative purposes was relevant to the facts of the case. The doll was depictive of the body of the victim and facilitated the illustration of the attacks she claimed she sustained at the hands of the defendant. It was those actions by the defendant that formed the elements of the offense for which he was now being prosecuted. We find no abuse of discretion in *234 the court's decision to allow the victim to use the doll for demonstrative purposes.
Furthermore, although defendant now alleges that the statement made by the victim regarding ruining the doll was calculated to inflame the jury, defendant did not object to this statement during the trial. If a defendant fails to either object, or to make known the action he desires the court to take, he waives that error for purposes of his appeal. LSA-C.Cr.P. art. 841A. See, State v. Day, 00-64 (La.App. 5 Cir. 5/30/00), 762 So.2d 264, 270. In the sixth assignment of error, defendant asserts he has been prejudiced by the erroneous denial of his motion for new trial. Defendant contends that numerous prejudicial trial errors warrant a new trial. In particular, he alleges, in the Motion for New Trial, that "the trial court made various errors that warrant a new trial." In the motion, he alleges the trial court erred when:
1) it failed to instruct the jury on the law of second degree battery;
2) it failed to charge the jury on the burden of proof for self defense;
3) it allowed inadmissible "other crimes" evidence; it failed to instruct the jury on the presumption that arises from the failure to call a witness;
4) it allowed the State to proceed with the simple battery case first;
5) it took judicial notice of testimony in the simple battery trial;
6) it restricted each party to 40 minutes closing argument.
The first three grounds of complaint have been previously discussed and have been found to lack merit. Thus, we will only consider the remaining three grounds.
The grounds for a new trial are set forth in LSA-C.Cr.P. art. 851, which provides in pertinent part, as follows:
LSA-C.Cr.P. art. 851. Grounds for new trial.
The motion for a new trial is based on the supposition that an injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:
(2) The court's ruling on a written motion, or an objection made during the proceedings, shows prejudicial error.
This Court, in State v. Quest 00-205 (La. App. 5 Cir. 10/18/00), 772 So.2d 772, 784, writ denied, 00-3137 (La.11/2/00), 800 So.2d 866, discussed the standard of review in cases such as the present:
Under La.C.Cr.P. art. 851, a motion for new trial is based upon the supposition that injustice has been done to the defendant, and unless such injustice is shown, the motion for new trial shall be denied no matter upon what allegations the motion is grounded. The decision on a motion for a new trial rests within the sound discretion of the trial judge and this ruling will not be disturbed on appeal absent a clear showing of an abuse of discretion.
(Citations omitted)
A hearing was held on the motion for new trial at which time the defendant argued all the issues listed above. After the hearing, the trial court denied the motion.
The first argument we will consider is that it was prejudicial error for the trial court to permit the district attorney to proceed with the simple battery trial before this trial. In making this argument, defendant reasons that the sole intent was for the prosecution to obtain a conviction by which it could impeach defendant at the felony trial.
*235 The State replies that the District Attorney has control of all criminal prosecutions.
LSA-C.Cr.P. art. 61 prescribes the powers of the District Attorney and provides in pertinent part as follows:
The district attorney has entire charge and control of every criminal prosecution instituted or pending in his district and determines whom, when, and how he shall prosecute."
The district attorney, therefore, and not the court, shall determine when and how defendant was to be prosecuted. For these reasons, this argument was correctly rejected as a basis for a new trial.
Defendant contends that it was prejudicial error for the trial judge to take judicial notice of the prior trial testimony on the simple battery charge because the proceedings were separate matters, occurring at different times.
The State replies that the court did not err because there is a higher burden at trial than during a Prieur hearing. Additionally, the State alleges that even if there was error, it was harmless because both sides had the opportunity to examine the witnesses during the trial.
A court shall take judicial notice, upon request, if the court is supplied with the information necessary for the court to determine that there is no reasonable dispute as to the fact(s). LSA-C.E. art. 201D.
In the present case, the prosecutor tried both the simple battery and this case before this same judge. The simple battery case was tried first at a bench trial in which this judge was the sole fact-finder and he found defendant guilty of that charge. Under these circumstances, it could not reasonably be argued that the facts that the court was taking notice of were the current subject of dispute.
As such, this codal article required the judge to take judicial notice of the testimony and conviction. Additionally, the defendant was not prejudiced by this action because the court, at the time of agreeing to take judicial notice, also allowed the defense counsel to present additional rebuttal evidence on the record. Other than calling defendant to testify again, no additional rebuttal evidence was presented. The trial judge correctly denied the motion for new trial on the basis of this alleged error.
Finally, defendant contends that it was prejudicial error to limit his closing argument to 40 minutes.
The State replies that the trial judge did not abuse his discretion in this regard.
The defendant presents no argument in support of this allegation. Issues raised but not argued or briefed are considered abandoned for purposes of appeal. Uniform RulesCourt of Appeal, Rule 2-12.4. State v. Alfonso, 496 So.2d 1218, 1219-1220 (La.App. 5 Cir.1986), cert. denied, 501 So.2d 206 (La.1987).
The trial judge has the duty to require criminal proceedings to be conducted in an "orderly and expeditious manner and to so control the proceedings that justice is done." LSA-C.Cr.P. art. 17. Additionally, the trial judge has great latitude in controlling the duration and limiting the scope of closing arguments. State v. Soler, 93-1042 (La.App. 5 Cir. 4/26/94), 636 So.2d 1069, 1081, writ denied, 94-1361 (La.11/4/94), 644 So.2d 1055.
In this case, each side was given an equal amount of time for arguments and the amount of time allowed (40 minutes) appears to be reasonable for a trial that lasted three days. Under these circumstances, the time allotted for argument did not constitute an abuse of the trial judge's *236 discretion. The trial judge did not err in refusing to grant a new trial on this basis.
In the final assignment of error, defendant argues the errors in this case cumulatively mandate reversal. By this assignment of error defendant alleges that, even if this Court finds no single error warranting reversal, cumulatively they mandate reversal.
The State responds that six non-meritorious issues do not make one with merit. We agree. This Court has previously rejected such an argument. In State v. Rochon, 98-717 (La.App. 5 Cir. 3/10/99) 733 So.2d 624, 633, this Court addressed the issue:
The combined effect of assignments of error, none of which warrant reversal, do not deprive a defendant of the right to a constitutionally fair trial. As all of defendant's other assignments have been fully addressed herein, defendant presents nothing new for this Court to review by this assignment of error. A defendant is not entitled to a perfect trial, only a fair one. We have thoroughly reviewed the record before us and have determined that defendant received a constitutionally fair trial.
(Citations omitted).
For reasons discussed herein, we find no merit in defendant's appeal and affirm the conviction and sentence.
AFFIRMED.
NOTES
[1] LSA-R.S. art. 14:18 provides: "The fact that an offender's conduct is justifiable, although otherwise criminal, shall constitute a defense to prosecution of any crime based on that conduct. The defense of justification can be claimed ... (7) When the offender's conduct is in defense of person or of property under any of the circumstances described in Articles 19 through 22."

LSA-R.S. art. 14:19 provides: "The use of force or violence upon the person of another is justifiable, when committed for the purpose of preventing a forcible offense against the person or a forcible offense or trespass against property in a person's lawful possession; provided that the force or violence used must be reasonable and apparently necessary to prevent such offense...."
[2] State v. Prieur, 277 So.2d 126 (La. 1973).