STATE OF LOUISIANA

VERSUS

JUSTIN A. HUTCHINSON

NO. 22-KA-536

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA


ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 20-6202, DIVISION "B"
HONORABLE R. CHRISTOPHER COX, III, JUDGE PRESIDING


August 18, 2023


**CORNELIUS E. REGAN**
**JUDGE**


Panel composed of Judges Stephen J. Windhorst,
Cornelius E. Regan, Pro Tempore, and Jason Verdigets, Pro Tempore


**AFFIRMED; REMANDED WITH INSTRUCTIONS**
> **CER**
> **SJW**
> **JMV**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Alexis Barteet
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
     Honorable Paul D. Connick, Jr.
     Juliet L. Clark
     Thomas J. Butler

COUNSEL FOR DEFENDANT/APPELLANT,
JUSTIN A. HUTCHINSON
     Holli A. Herrle-Castillo

**REGAN, PRO TEMPORE, J.**

Defendant, Justin A. Hutchinson, appeals his convictions and sentences for second degree murder, obstruction of justice, and two counts of possession of a firearm by a convicted felon. For reasons stated more fully below, we affirm.

STATEMENT OF THE CASE

On March 11, 2021, a Jefferson Parish Grand Jury indicted defendant with the second degree murder of Rashad Lewis in violation of La. R.S. 14:30.1 (count one), obstruction of justice in violation of La. R.S. 14:130.1 (count two), and two counts of possession of a firearm by a convicted felon in violation of La. R.S. 14:95.1 (counts 3 and 4). Defendant entered pleas of not guilty at arraignment.

On May 22, 2022, defendant filed a motion in limine to prohibit the State from introducing evidence regarding a .40 mm casing recovered from the scene of a subsequent shooting in Bogalusa, Louisiana, that matched .40 mm casings found on the scene in the instant case. Defendant also sought to prohibit the State from using his Instagram posts to establish his presence in Bogalusa approximately two weeks prior to the subsequent shooting. Following oral argument on May 23, 2022, the trial court denied the motion in limine in part and allowed the State to introduce evidence regarding the casing found at the scene of the subsequent shooting in Bogalusa. However, the trial court granted the second part of defendant's motion in limine and prohibited the State from introducing defendant's Instagram records indicating defendant's prior presence in Bogalusa.

On May 24, 2022, trial commenced before a twelve-person jury, and on May 26, 2022, the jury unanimously found defendant guilty as charged on all four counts. On July 28, 2022, defendant filed a Motion for Post-Verdict Judgment of Acquittal, a Motion for New Trial, and a Motion for Appeal. On July 29, 2022, the trial court denied defendant's Post-Verdict Judgment of Acquittal and Motion for New Trial. After defendant waived delays, the court sentenced him to life in

prison at hard labor without the benefit of parole, probation, or suspension of sentence on count one, forty years imprisonment at hard labor on count two to run consecutively to counts one, three and four, and twenty years imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence on counts three and four to run concurrently with count one. The trial court also waived all mandatory fines.

On August 1, 2022, the trial court granted defendant's Motion for Appeal. Defendant raises the following counseled assignments of error on appeal: 1) the trial court erred by allowing evidence that the casing found in Bogalusa matched casings from the firearm used in this case; and 2) the evidence against him was insufficient because the State failed to prove his identity as the perpetrator of the crimes. Defendant also raises *pro se* assignments of error arguing that the State's use of peremptory challenges to exclude potential African-American jurors from the jury violated *Batson*. Defendant further argues that the trial court erred by not ruling on whether the State provided race-neutral reasons for its peremptory challenges, and erred by allowing the trial to proceed without a fair-cross section of Jefferson Parish's population.

**FACTS**

This matter involves a homicide that occurred around 10:00 p.m. on October 21, 2022 in the parking lot of 3J's Bar on Lapalco Boulevard in Marrero, Louisiana. Detective Dwain Rullman, with the Jefferson Parish Sheriff's Office (JPSO) juvenile division, testified that on the night of the homicide, he was driving an unmarked unit on Lapalco Boulevard when he heard gunshots as he drove past 3J's Bar. He slowed down and rolled down his window to get a better view. He observed a large group of people running from the parking lot. He then saw a black male wearing a yellow shirt and blue and white pants run behind his car with

a firearm in his hand. Detective Rullman radioed police dispatch and provided a description of the armed suspect.

Detective Rullman then made a U-turn and chased the suspect down Betty Boulevard in the Lincolnshire neighborhood. The detective lost sight of the suspect when he jumped the fence at 2024 Betty Boulevard. Detective Rullman discovered a firearm in the backyard of the residence, and remained at the scene until the firearm was photographed and collected.[1] At trial, Detective Rullman identified defendant as the same person he saw running behind his vehicle with a gun on the night of the murder.

Retired Detective Donald Zanotelli testified that at the time of the homicide, he was employed with JPSO in the homicide division. He was the first homicide detective on the scene at 3J's Bar, and he found a 2016 black Mercedes SUV in the parking lot with the driver's side door open. The victim, Rashad Lewis, was slumped over in the driver's seat with multiple gunshot wounds to the head, torso, and left leg.[2] Detective Zanotelli was not able to locate any witnesses at the scene because everyone fled after the shooting. The detective explained that he collected surveillance video from cameras located in the parking lot of the bar and was able to identify the first three numbers of the license plate for a Nissan Altima leaving the scene. Detective Zanotelli then used the automatic license plate recognition system (ALPR) to identify Mitchell Videau as the owner of the vehicle. He further testified that the surveillance video captured Mr. Videau with the victim and defendant immediately prior to the homicide.

---

[1] Sergeant Robert Pellegrin, assigned to the JPSO crime scene division, testified that he photographed and collected a High-Point 9 mm Luger from the backyard of 2024 Betty Boulevard on the night of the homicide. He swabbed the grip of the gun for DNA analysis and submitted the gun and swabs to the crime lab.

[2] Dr. Michael Defatta testified as an expert in the field of forensic pathology. Dr. Defatta concluded that the victim died of multiple gunshot wounds to the abdomen, pelvis and head, and the manner of death was homicide.

Detective Anthony Buttone with the JPSO homicide division served as the lead detective for this matter. He reviewed three different camera angles of the scene from the surveillance video obtained from 3J's Bar. During his testimony, he narrated the video and identified Mr. Videau, who was wearing all black clothing and a baseball cap that night. Detective Buttone explained that at the time of the shooting, the victim was sitting in the driver's seat of his vehicle, and the shooter was standing outside of the open driver's side door wearing a yellow shirt and blue and white pants. The video did not show clear details of the shooter's face. The shooter suddenly began firing at the victim and then leaned into the vehicle and removed what appeared to be a firearm. The shooter then ran to the front of the vehicle and used the second firearm he removed from the vehicle to continue shooting at the victim. The shooter ran from the scene and in the direction of the Lincolnshire neighborhood. Detective Buttone testified that Tuskegee Street, where defendant lived, is also located in the Lincolnshire neighborhood. According to Detective Buttone, neither the victim nor Mr. Videau were in possession of a firearm at the time of the shooting based on his review of the surveillance video.

After the shooter fled, the video showed Mr. Videau return to the scene and lean into the victim's vehicle. Mr. Videau also picked up items from the ground outside of the vehicle. Mr. Videau testified at trial that he picked up his cell phone and denied removing any items from the victim's vehicle.[3] The video also showed Mr. Videau removing an AK-47 from his vehicle after the shooting and walk away from the scene. The video then showed Mr. Videau returning without the firearm.

Detective Buttone further testified that investigators recovered fired 9 mm casings from the area next to the driver's side of the victim's vehicle, and eight .40

---

[3] Doug Freese, an assistant district attorney with the Jefferson Parish District Attorney's Office, testified regarding the Mr. Videau's plea deal and indicated that Mr. Videau admitted to removing a cell phone from near the victim's body, as well as a cell phone that was dropped on the ground.

caliber casings from the front of the vehicle. They searched for the victim's cell phone, but they could not locate it. A Saints bag located on the victim contained a black digital scale, two cigar packs, two foil packs, marijuana, a white powder substance, and a .40 caliber pistol magazine containing live projectiles.

Detective Buttone further explained that after identifying Mr. Videau from his vehicle's license place, they obtained a warrant for his arrest based on the surveillance video for removing evidence from the scene and for being a convicted felon in possession of a firearm. At the time of his arrest on October 23, 2020, Mr. Videau was wearing the same baseball cap seen in the surveillance video. Mr. Videau initially indicated that he did not want to speak to investigators. Detective Buttone then obtained a search warrant for Mr. Videau's DNA and after reviewing the warrant and seeing that it involved an investigation for second degree murder, Mr. Videau requested to speak with the investigators. Mr. Videau initially spoke to Detective Sergeant Thomas Gai in a recorded interview and told the detective he did not see the shooting. Mr. Videau later stated that the shooter's nickname was "Jeeky," and he resided in the Lincolnshire neighborhood with his grandmother on Tuskegee Drive.

Detective Buttone also testified that he received the name of Larry Garrison as a potential suspect. Detective Buttone asked Detective Blaine Howard to view the video surveillance because he was familiar with Mr. Garrison. Detective Howard indicated the shooter was not Mr. Garrison. Detective Buttone also placed a photograph of Mr. Garrison in a lineup and presented it to Mr. Videau using the sheriff's office "double-blind" procedure.[4] Mr. Videau did not make an identification in the lineup with Mr. Garrison. Using the nickname "Jeeky,"

---

[4] Detective Buttone explained the double-blind procedure for photographic line ups. He testified that the lineup is provided to an officer who does not know the names of the people in the lineup. The lineup is placed in a closed, unmarked folder, and provided to the witness. The officer then leaves the witness or victim alone in the room to open the folder and view the line up to determine whether he or she can make an identification.

Detective Buttone then searched databases and found an individual with the name of Justin Hutchinson who resided on Tuskegee Drive in the Lincolnshire neighborhood. He placed Mr. Hutchinson's photograph in a lineup and provided it to Sergeant Gai. Detective Buttone testified that they utilized the same double-blind procedure and Mr. Videau identified defendant as the shooter.

Detective Buttone also obtained a search warrant and return for an Instagram account with the name "Jeeky_Money." Detective Buttone reviewed the records he received from Instagram, and explained at trial that "Justin_ABM@icloud.com" is the registered email for the Instagram account, and "remy_bully504" is the "vanity name" for the account. Detective Buttone testified that a message dated October 21, 2020, from "shes.neek_Im.nee_30" asked, "Wats up Justin[?]" Another message dated October 22, 2020, from remy_bully504 stated, "I'm at 3 jays across from tha hood[.]" Detective Buttone also testified regarding a picture posted to the account that shows defendant wearing what appears to be the same shoes as seen in the surveillance video and holding a yellow t-shirt that appears to show the same unique logo as seen in the surveillance video. A message from munchiemunchh dated October 2, 2020, states, "Hey Justin[.]" Further, in a message dated October 16, 2020, remy_bully504 stated, "Real bihh yu going out 2night 3 jays I'm bringing tha good back[.]"

Detective Buttone testified that he obtained an arrest warrant for defendant for second degree murder, obstruction of justice, and two counts of convicted felon in possession of a firearm based on the two firearms used during the shooting. Detective Buttone explained that the first firearm the shooter used was a Hi-Point 9 mm pistol, and nine cartridges were ejected from that firearm. The firearm recovered on Betty Boulevard was a 9 mm Hi-Point pistol. He testified that they never located the second firearm which defendant removed from the victim's vehicle. However, investigators subsequently received information that the second

gun was used in a shooting in Bogalusa, Louisiana, five days after the homicide at issue in this case.

Detective Buttone finally testified that on November 13, 2020, defendant arrived at the investigations bureau and surrendered. Detective Buttone obtained a search warrant for defendant's DNA. However, the DNA analyzed from the scene did not match defendant's DNA.[5]

Kortnie Layrisson, an expert in the field of latent print processing and comparison, testified that at the time of the homicide, she was a member of the JPSO homicide response team. She testified that she fingerprinted the victim at the scene in order to obtain his identity. She also processed the victim's vehicle and obtained fingerprints belonging to the victim. She identified a print on the rear door of the victim's vehicle on the driver's side as belonging to Mitchell Videau. She was not able to lift any prints from the Hi-Point 9 mm pistol.

Mitchell Videau testified at trial that in October 2020, he was having a party at 3J's Bar for his twin brother who passed away. Prior to the shooting, the victim was sitting out in front of 3J's in his car with the driver's side door open and talking with Mr. Videau, defendant and several other individuals. Mr. Videau knew the victim because they were incarcerated together and he called the victim "Woo." Mr. Videau stated that he was standing in between defendant and the victim, when defendant shot the victim. Mr. Videau did not see the victim with a gun, and he did not hear the victim make any threats toward defendant. He further stated that to his knowledge, the victim did not have issues with defendant, and they did not have an altercation prior to the shooting.

---

[5] April Solomon, a DNA analyst with JPSO Regional DNA Laboratory, testified as an expert in forensic DNA analysis. She explained that she conducted a DNA analysis on the swab of the 9 mm firearm recovered from the backyard on Betty Boulevard and a reference sample from defendant. DNA was present on the firearm, but it was insufficient to produce a valid profile.

After the shooting, Mr. Videau ran inside the club. When he came back outside, he picked up his phone that he dropped during the shooting from the ground. He then checked on the victim, but he did not appear to be alive. He denied removing evidence from the scene or from the victim's car. However, Mr. Videau admitted that after the shooting, he removed an assault rifle from his vehicle and placed it in the trunk of a vehicle driven by someone he did not know. He explained that he removed the firearm because he was a convicted felon who could not possess a firearm.[6] Mr. Videau then left the scene before police arrived.

Two days after the shooting, police arrested Mr. Videau for obstruction of justice and possession of a firearm by a convicted felon. He was taken to the investigations bureau for questioning. Mr. Videau initially told the police that he did not see the shooting because he was worried about incriminating himself. Mr. Videau eventually told the investigators the shooter's name and told them he lived on Tuskegee in Lincolnshire. He further testified that investigators presented him with two lineups on two different days. He did not identify anyone in the first lineup. In the second lineup, he identified defendant as the person who shot the victim. Mr. Videau stated that he was not promised or offered anything to pick defendant out of the lineup and he was not told which photograph to select.

Mr. Videau also testified about his plea agreement with the District Attorney's Office. He explained that in exchange for telling the truth about the shooting at issue, the District Attorney's Office dismissed his charge for felon in possession of a firearm, and he entered a guilty plea to the charge of obstruction of justice. As part of the agreement, the District Attorney's Office did not file a habitual offender bill and Mr. Videau received a one year sentence. He acknowledged that if he did not cooperate by testifying truthfully at trial, the

---

[6] He explained that he had two prior felony convictions for possession of cocaine and a conviction for attempted murder.

District Attorney's Office would refile the felon with a firearm charge. On the day of his trial testimony, Mr. Videau had served his one-year sentence and was in jail for new unrelated charges for resisting an officer with force or violence, possession of marijuana, violating a restraining order, and simple criminal damage. He testified that the prosecutor did not offer or promise anything for testifying at trial in relation to his new pending charges.

Detective Sergeant Gai testified that at the time of the homicide, he was a sergeant with the JPSO homicide division. He was present when Mr. Videau was brought to the criminal investigations bureau and explained that Mr. Videau initially did not want to make a statement. While investigators were making arrangements to obtain an arrest warrant, Mr. Videau was waiting in Detective Sergeant Gai's office and subsequently expressed a desire to provide information. Detective Sergeant Gai explained that he conducted the interview because he previously interacted with members of the Videau family as a patrolmen and Mr. Videau felt comfortable speaking with him. Mr. Videau advised him during the interview that "Jeeky" was the shooter, and he lived with his grandmother on Tuskegee in the Lincolnshire area.

Detective Sergeant Gai also testified regarding the photographic lineups he provided to Mr. Videau. He explained that he did not know which photograph was of the suspect in the lineup, but subsequently learned that Mr. Videau selected a photograph of defendant in the second lineup. He confirmed that he did not offer or promise anything to Mr. Videau to select a picture in either lineup.

Alexis Rivera testified as an expert in the field of firearm and tool mark examination. She explained to the jury that just as each person has unique fingerprints, every firearm has specific markings that identify to a specific gun. She testified that she collected nine 9 mm fired cartridge casings from the scene by the driver's door of the victim's vehicle. She also analyzed the 9 mm Hi-Point

firearm recovered from the backyard on Betty Boulevard by conducting a test fire. She concluded that the 9 mm casings collected from the scene were all fired from the Hi-Point 9 mm firearm recovered from the Betty Boulevard backyard. She also collected eight .40 caliber fired cartridge casings from the scene near the front of the victim's vehicle. She entered her findings regarding these casings into the National Integrated Ballistics Information Network (NIBIN) database and later learned that the .40 caliber casings matched a casing collected in Bogalusa a few days after the instant matter.[7]

Officer Dona Quintanilla with the JPSO crime laboratory testified as an expert in the taking and analysis of latent fingerprints. She stated that she took defendant's fingerprints prior to trial and compared them to a ten-print "AFIS" card connected to a certification packet for defendant's February 2, 2015 conviction of aggravated assault with a firearm. After comparison, she opined that both sets of fingerprints are for the left thumb of defendant.

## DISCUSSION

*Sufficiency of the Evidence*

We first address defendant's counseled assignment of error that the evidence was insufficient to uphold the convictions.[8] Defendant argues that the State failed to prove his identity as the shooter because the shooter's face was not clear in the videotape and the only witness who identified defendant was offered a deal to testify.

---

[7] Detective Buttone testified that NIBIN is a computer database containing ballistics evidence and that the computer can match firearm identifications. He testified that it was his understanding that once the computer makes a preliminary hit, a firearms identification expert reviews the information and confirms the match.

[8] When the issues on appeal relate to both the sufficiency of the evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the entirety of the evidence. *State v. Hearold*, 603 So.2d 731, 734 (La. 1992).

The constitutional standard for sufficiency of the evidence is whether, upon viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could find that the State proved all of the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Baham*, 14-653 (La. App. 5 Cir. 3/11/15), 169 So.3d 558, 566, *writ denied*, 15-40 (La. 3/24/16), 190 So.3d 1189. In its determination of whether any rational trier of fact would have found the defendant guilty, a reviewing court will not re-evaluate the credibility of witnesses or re-weigh the evidence. *State v. Lawrence*, 21-733 (La. App. 5 Cir. 11/2/22), 362 So.3d 807, 816. The credibility of a witness is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. *Id*.

With respect to count one, second-degree murder is "the killing of a human being ... [w]hen the offender has a specific intent to kill or to inflict great bodily harm." La. R.S. 14:30.1(A)(1). For count two, La. R.S. 14:130.1(A) defines the crime of obstruction of justice in relevant part, as:

> [A]ny of the following when committed with the knowledge that such act has, reasonably may, or will affect an actual or potential present, past, or future criminal proceeding in this Section:
>
> (1) Tampering with evidence with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to a criminal investigation or proceeding. Tampering with evidence shall include the intentional alteration, movement, removal, or addition of any object or substance either:
>
> > (a) At the location of any incident which the perpetrator knows or has good reason to believe will be the subject of any investigation by state, local, or United States law enforcement officers . . . .

Finally, with respect to the final two counts of possession of a firearm by a convicted felon, La. R.S. 14:95.1 provides that it is unlawful for any person who has been convicted of a felony, including aggravated assault with a firearm, to possess a firearm or carry a concealed weapon. To support a conviction for

possession of a firearm by a convicted felon, the State must prove: (1) the possession of a firearm; (2) a previous conviction of an enumerated felony; (3) absence of the ten-year statutory period of limitation; and (4) general intent to commit the offense. *State v. Bell*, 21-599 (La. App. 5 Cir. 6/22/22), 343 So.3d 914, 922, *writ denied*, 22-1179 (La. 9/27/22), 347 So.3d 155.

On appeal, defendant does not argue that the State failed to prove the elements of the crimes for which he was convicted, but rather claims that the State failed to prove his identity as the shooter. Accordingly, this Court need not address the sufficiency of the evidence as it relates to the statutory elements of second degree murder, obstruction of justice and convicted felon with a firearm. *See State v. Mason*, 10-284 (La. App. 5 Cir. 1/11/11), 59 So.3d 419, 426, *writ denied*, 11-306 (La. 6/24/11), 64 So.3d 216.[9] Rather, encompassed within proving the elements of an offense is the necessity of proving the identity of the defendant as the perpetrator. *State v. Garrison*, 19-62 (La. App. 5 Cir. 4/23/20), 297 So.3d 190, 203, *writ denied*, 20-547 (La. 9/23/20), 301 So.3d 1190, *cert. denied*, -- U.S. --, 141 S.Ct. 2864, 210 L.Ed.2d 967 (2021). Where the key issue is identification, the State is required to negate any reasonable probability of misidentification to carry its burden of proof. *Id*. at 204. In the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. *State v. Clifton*, 17-538 (La. App. 5 Cir. 5/23/18), 248 So.3d 691, 703.

Defendant argues that Mr. Videau's identification of defendant as the shooter was not credible because Mr. Videau intentionally misidentified defendant in order to obtain a deal from the State. In *State v. Dominguez*, 14-1 (La. App. 5 Cir. 8/28/14), 148 So.3d 648, 655-56, *writ denied*, 14-2033 (La. 5/22/15), 170

---

[9] Our review of the evidence introduced at trial reflects that the State presented sufficient evidence to establish the essential statutory elements of the offenses at issue.

So.3d 982, the defendant also challenged the credibility of a witness under similar circumstances. The witness testified that he had a plea deal with the State in exchange for his testimony against the defendant. In affirming the defendant's conviction, this Court reasoned that the plea deal goes to the witness' credibility and the jury found the witness' testimony to be believable and gave it the credibility they believed it deserved. This Court further concluded that there was "nothing in the record to show that the jury abused its discretion in its assessment of credibility, or made factual findings which were manifestly erroneous." *Id.* at 656.

Mr. Videau was seen in the surveillance video standing next to the shooter at the time of the murder. Mr. Videau identified "Jeeky" as the shooter and selected defendant as the shooter from a photographic lineup. The jury observed Mr. Videau and heard his testimony. The jury also viewed the video from the shooting, as well as the video of Mr. Videau's lineup identification. The jury heard testimony regarding Mr. Videau's prior convictions, pending charges, and his plea agreement for his testimony in the instant case. Based on the unanimous verdicts for all four counts, the jury obviously found Mr. Videau to be credible, despite any inconsistencies in his testimony and the plea agreement he received.

The video surveillance also captured the shooter firing the first gun at the victim nine times and shooting the second gun at the victim eight times. Detective Rullman testified that he heard gunshots, and he saw a suspect running from 3J's Bar with a firearm in his hand. The suspect was wearing a yellow shirt and blue and white pants. During trial, Detective Rullman identified defendant as the suspect running from the scene. Detective Buttone testified regarding an Instagram account registered to the email "Justin_ABM@icloud.com." The Instagram records contained a photograph of defendant wearing the same shoes as seen in the surveillance video. In that same photograph, defendant is holding a

yellow shirt similar to the shirt worn by the shooter in the surveillance video. Messages to the Instagram account also referenced the name, Justin, and indicate that the account holder went to 3J's Bar.

Based on this evidence, we conclude that the evidence of defendant's identity as the perpetrator of the crimes negated any possibility of misidentification. We find no merit to defendant's claim that the State presented insufficient evidence to sustain his convictions beyond a reasoned doubt.

*Evidence of Matching Casing*

In his second counseled assignment of error, defendant argues that the trial court erred by denying his motion in limine in part and allowing testimony regarding the matching casing found in Bogalusa. Defendant contends that this testimony constituted evidence of another crime governed by the admissibility standard set forth in La. C.E. art. 404(B)(1). He further argues that the trial court erred in allowing the evidence because it was highly prejudicial and not probative of any issue in the case.

At the hearing on defendant's motion in limine, the State argued that it intended to introduce evidence regarding the Bogalusa casing to prove the obstruction of evidence charge filed against defendant. The State argued that La. C.E. art. 404(B) did not apply because it did not intend to offer evidence of the casing to prove that defendant was involved in the subsequent shooting in Bogalusa. Rather, the State argued that it intended to offer the evidence to show although it was never located by police, a gun used in this murder was removed from the scene because matching casings were found at both scenes. Therefore, the State argued that the evidence of the casing was not evidence of another crime or bad act by defendant governed by La. C.E. art. 404(B).

"The fundamental rule in Louisiana governing the use of evidence of other crimes, wrongs, or acts is that such evidence is not admissible to prove that the

accused committed the charged crime because he has committed other such crimes in the past." *State v. Williams*, 09-48 (La. App. 5 Cir. 10/27/09), 28 So.3d 357, 363, *writ denied*, 09-2565 (La. 5/7/10), 34 So.3d 860.

La. C.E. art. 404(B)(1) provides:

> Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

Rulings on the admissibility of evidence will not be disturbed, absent an abuse of discretion. *State v. Gatson*, 21-156, 21-157 (La. App. 5 Cir. 12/29/21), 334 So.3d 1021, 1038.

In its ruling granting the motion in limine in part, the trial court explained that it agreed with defendant's argument to the extent the State sought to introduce any evidence subject to La. C.E. art. 404(B) due to the late notice of the evidence. The trial court particularly agreed to exclude any evidence regarding defendant's presence or connection with the shooting in Bogalusa agreeing that "[w]e have not had any sort of 404 pretrial motion practice in this particular case on this issue." However, the trial court ruled that it would allow evidence that a casing recovered in the Bogalusa shooting matched one of the guns used in the instant matter as evidence that the gun was in Bogalusa after it was removed from the scene in the instant matter. It is apparent from this ruling that the trial court did not consider this limited evidence to be evidence of "other crimes, wrongs or acts" subject to the admissibility standard set forth in La. C.E. art. 404(B)(1) because it did not involve another crime committed by defendant.

We agree that the disputed evidence is not subject to La. C.E. art. 404(B). The prohibition against other crimes pertains to other crimes by the defendant, not other crimes of someone else. *State v. Trim*, 12-115 (La. App. 5 Cir. 10/16/12), 107 So.3d 656, 665, *writ denied*, 12-2488 (La. 4/19/13), 111 So.3d 1030; *State v. Joseph*, 96-187 (La. App. 5 Cir. 11/14/96), 685 So.2d 237, 242. The trial court excluded all evidence regarding defendant's connection with Bogalusa where the subsequent shooting occurred and only allowed evidence regarding the matching casings to prove the gun was removed from the scene of the current case for purposes of the obstruction of justice charge. This limited evidence was relevant to establish an element of the offense and was more probative than prejudicial. The trial court did not abuse its discretion by allowing limited testimony regarding the matching casing found in Bogalusa.

Even if the trial court erred in admitting the evidence at trial, the erroneous admission of other crimes evidence is subject to harmless error analysis. *Gatson*, 334 So.3d at 1039. In determining harmless error it is "not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in the trial was surely unattributable to the error." *State v. Massey*, 11-358 (La. App. 5 Cir. 3/27/12), 97 So.3d 13, 29, *writ denied*, 12-991 (La. 9/21/12), 98 So.3d 332.

The evidence at trial established defendant's identity as the perpetrator of all the offenses. The surveillance video from 3J's Bar captured the shooting. Mr. Videau identified defendant as the shooter. Detective Rullman identified defendant as the person he saw running with a firearm in his hand and wearing the same clothing as seen in the surveillance video. We find that the guilty verdicts were unattributable to the error, if any. Therefore, this assignment of error lacks merit.

*Batson Challenges*[10]

Defendant also filed a *pro se* supplemental brief raising additional assignments of error relating to two *Batson* challenges he made during jury selection. Defendant argues that despite a significant number of potential African-American jurors on the panel, no African-American jurors served on the jury that convicted him. He contends that most of the African-American jurors were removed from the panel by means of challenges for cause granted by the trial court, and then the State exercised peremptory challenges to strike the few remaining African-American jurors.[11] Defendant contends that the trial court erred by denying his *Batson* challenges and allowing the State to use peremptory challenges strike jurors for racially motivated reasons. Defendant further argues that the trial court did not specifically rule on whether the State provided race-neutral reasons for striking jurors and contends that he did not receive a fair trial because the jury venire was not comprised of a fair cross-section of the Jefferson Parish population. Upon complete review of the record, we find no error in the trial court's ruling denying defendants' *Batson* challenges.

The Equal Protection Clause of the United States Constitution prohibits purposeful discrimination on the basis of race in the exercise of peremptory challenges. U.S. Const. Amend. 14; *State v. Chester*, 19-363 (La. App. 5 Cir. 2/3/21), 314 So.3d 914, 978, *writ denied*, 21-350 (La. 6/8/21), 317 So.3d 321. In *Batson*, *supra*, the United States Supreme Court held that an equal protection violation occurs when a party uses a peremptory challenge to exclude a prospective juror on the basis of race. The Louisiana legislature codified the *Batson* decision in La. C.Cr.P. art. 795(C), which provides that no peremptory challenge made by

---

[10] *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

[11] Defendant does not raise any issues on appeal with respect to the challenges for cause granted by the trial court.

the State or the defendant shall be based solely upon the race or gender of the juror. *State v. Massey*, 11-357 (La. App. 5 Cir. 3/27/12), 91 So.3d 453, 467, *writ denied*, 12-991 (La. 9/21/12), 98 So.3d 332.

In *Batson*, the United States Supreme Court established a three-step analysis to be applied when addressing a claim that peremptory challenges of prospective jurors were based on race. *State v. Jacobs*, 07-887 (La. App. 5 Cir. 5/24/11), 67 So.3d 535, 554, *writ denied*, 11-1753 (La. 2/10/12), 80 So.3d 468, *cert. denied*, 568 U.S. 838, 133 S.Ct. 139, 184 L.Ed.2d 67 (2012). Under *Batson* and its progeny, a defendant challenging a peremptory strike must first establish a *prima facie* case of purposeful discrimination. Second, if a *prima facie* showing is made, the burden shifts to the State to articulate a neutral explanation for the challenge. Third, the trial court then must determine if the defendant has carried the ultimate burden of proving purposeful discrimination. *State v. Sparks*, 88-17 (La. 5/11/11), 68 So.3d 435, 468.

A trial judge's demand that a prosecutor justify his peremptory strikes is tantamount to a finding that the defense has produced enough evidence to support an inference of discriminatory purpose to establish a *prima facie* case. *State v. Daniels*, 18-307 (La. App. 5 Cir. 6/11/19), 275 So.3d 380, 393. The burden then shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. *Id.* at 392. This second step does not demand an explanation that is persuasive, or even plausible. *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995). The race-neutral explanation must be one that is clear, reasonably specific, legitimate and related to the case at bar. *Daniels*, 275 So.3d at 394. At the second step of the *Batson* inquiry, the issue is the facial validity of the prosecutor's explanation. *Purkett*, *supra*. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral. *Id*.

The trial court must then determine whether the defendant has established purposeful discrimination. *Jacobs*, 67 So.3d at 555. It is at this third step that implausible explanations offered by the prosecution "may (and probably will) be found to be pretexts for purposeful discrimination." *Id.* (*quoting Purkett*, 514 U.S. at 768, 115 S.Ct. at 1771). The final step of *Batson* involves evaluating the persuasiveness of the justification proffered, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. *Purkett*, 514 U.S. at 768, 115 S.Ct. at 1771.

A defendant challenging a peremptory strike has the burden to establish discrimination in jury selection. In determining whether a defendant has met his burden of showing purposeful racial discrimination in the State's exercise of peremptory challenges, the proper question is whether the proof offered by the defendant, when weighed against the State's proffered race-neutral reasons, is strong enough to convince the trier of fact that the claimed discriminatory intent is present. *State v. Bourgeois*, 08-457 (La. App. 5 Cir. 12/16/08), 1 So.3d 733, 738, *writ denied*, 09-336 (La. 11/6/09), 21 So.3d 298. Thus, the focus of the *Batson* inquiry is upon the intent of the prosecutor at the time he exercised his peremptory strikes. *State v. Florant*, 12-736 (La. App. 5 Cir. 5/23/13), 119 So.3d 635, 642, *writ denied*, 13-1451 (La. 1/10/14), 130 So.3d 319. If a prosecutor's proffered reason for striking an African-American panelist applies just as well to an otherwise similar nonblack panelist who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step. *Chester*, 314 So.3d at 981 (*citing Miller-El v. Dretke*, 545 U.S. 231, 241, 125 S.Ct. 2317, 2325, 162 L.Ed.2d 196 (2005).

Whether there has been intentional racial discrimination is a question of fact. *State v. Edwards*, 06-643 (La. App. 5 Cir. 3/27/07), 957 So.2d 185, 194, *writ denied*, 08-1988 (La. 8/29/08), 989 So.2d 110. A trial judge's findings on a claim

of purposeful discrimination are entitled to great deference by the reviewing court because they depend largely on credibility evaluations. *Massey*, 91 So.3d at 469. Credibility can be measured by factors including the prosecutor's demeanor, how reasonable or how improbable the explanations are, and whether the proffered reason has some basis in accepted trial strategy. *State v. Wilson*, 09-170 (La. App. 5 Cir. 11/10/09), 28 So.3d 394, 405, *writ denied*, 09-2699 (La. 6/4/10), 38 So.3d 299. The trial judge has the advantage of observing the characteristics and demeanor of the attorneys and prospective jurors. Therefore, the court occupies the best position for deciding whether a discriminatory objective underlies the peremptory challenges. *Id.* "[A] trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." *Snyder v. Louisiana*, 552 U.S. 472, 477, 128 S.Ct. 1203, 1207, 170 L.Ed.2d 175 (2008).

*Review of Voir Dire*

The parties selected the jurors from three panels of potential jurors that comprised a venire of 60 potential jurors. The venire included 43 white jurors, 16 African-American jurors, and one Hispanic juror. During *voir dire*, 11 African-American jurors and 6 white jurors were struck from the panel based on cause challenges raised by the parties and granted by the trial court. The State exercised 8 of its 12 peremptory challenges and defendant exercised all 12 of his peremptory challenges. The State used 4 of its 8 peremptory challenges to excuse African-American jurors from the panel, and defendant argues that the State's peremptory challenges used to strike these African-American jurors were racially motivated.[12]

On the first panel of potential jurors, the State used peremptory challenges to strike Charman Broome, an African-American male; Rita Hellemn, a white female;

---

[12] Defendant contends that the State exercised 5 peremptory challenges against African-American jurors, including Mary Lewis, Charman Broome, Charlene Pastore, Tiffany Cook, and Joseph Vail. However, the trial court and parties agreed that Mr. Vail was a white male. Further, defendant did not raise a *Batson* challenge or any argument against the State's use of a peremptory challenge to strike Mr. Vail.

and Charlene Pastore, an African-American or Hispanic female.[13]  After the trial court excused the challenged jurors from the first panel, the trial court cleared the courtroom of potential jurors.  Defendant then raised *pro se* concerns that the jury selection proceedings occurred off the record.  The trial court and defendant's counsel explained to defendant that the jury selection proceedings were done at the bench so that the jurors could not hear and further explained that the proceedings at the bench were recorded.  Defendant then indicated *pro se* that he wanted to raise a *Batson* challenge because all African-American jurors were struck from the first panel.  The trial court recessed for a break and when jury selection commenced again, neither defendant nor his counsel indicated that they wanted to proceed with a *Batson* challenge.

With respect to the second panel of potential jurors, the State exercised peremptory challenges to strike Joseph Vail, a white male; Brittany Stevens, a white female; and Mary Lewis, an African-American female.  After the State exercised a peremptory challenge to strike Ms. Lewis, defendant raised a *Batson* challenge.  Defendant argued that the trial court struck most of the African-American jurors from the first two panels by granting challenges for cause and the State exercised peremptory challenges to strike the three remaining African-American jurors on the first two panels.  Before the trial court ruled as to whether defendant made a *prima facie* showing of purposeful discrimination, the State volunteered the following reasons for striking the three African-American jurors:[14]

> So as to Juror No. 328, Mr. Broome.  Mr. Broome said, among other things, he has a son incarcerated for drugs that has a conviction out of Jefferson Parish.  He also stated that he'd like to hear from the defendant.  He was shaking his head no when asked if he could evaluate the law if there's no DNA or fingerprints.  He also said if no blood, not you, not guilty.  So among many things, that's why the State sought to use a peremptory on Mr. Broome.

---

[13] The trial court indicated and parties agreed that Ms. Pastore was African-American or Hispanic.
[14] As noted above, when a prosecutor offers a neutral reason, the question of whether the defendant made a *prima facie* showing of intentional discrimination is rendered moot.  *Sparks*, 68 So.3d at 473.

* * *

So Ms. Pastore, she had -- she said when asked about life whether or not she can vote guilty or not guilty even if the State has proven it beyond a reasonable doubt knowing the defendant would receive a life sentence, she said, and I quote, "I don't know." Given the fact that this is a life, mandatory life case, obviously the State used a peremptory for that.

Further, she said, if a gun was in a holster and someone said, I'm going to kill you, that automatically means a threat. She had a nephew that had a murder charge -- (inaudible).

* * *

Ms. Lewis, as we're well aware, we actually tried to cause her based on the fact that we don't think she'd be fair and impartial. She said that she cannot judge, her religious beliefs, she doesn't believe she can judge. And I asked her specifically the same question Defense counsel asked her, because I knew that's what he was going to ask is and she said that if she had to vote, she would vote not guilty. I know that she's rehabilitated. Our concern, obviously, is this is a life sentence and we don't want someone who's going to waffle back and forth between whether or not they can put guilty or not guilty based on a life sentence.

The trial court found that the State provided valid reasons for exercising its peremptory challenges and denied the *Batson* challenge.

Jury selection continued on the following day and the State used its seventh peremptory challenge to strike Tiffany Cook, an African-American female. Defendant re-urged his *Batson* challenge and the State volunteered the following reasons for exercising a peremptory challenge to strike Ms. Cook: "So Ms. Cook has a brother who was convicted of second degree murder. She also stated that holding a gun is enough for her of a threat. She refers to like kill or be killed, was sort of her position." The trial court determined that these were also valid reasons for exercising a peremptory challenge and denied defendant's second *Batson* challenge.[15]

Defendant argues that the State's peremptory challenges were racially motivated because no African-American jurors served on the jury despite the fact

---

[15] Ultimately, the jury included one Hispanic female, six white men, and five white females.

that there were 17 potential African-American jurors. Our review of the record indicates that there were 16, not 17, potential African-American jurors and the trial court granted 11 challenges for cause with respect to these potential jurors. As previously indicated, defendant does not challenge the trial court's rulings on the cause challenges and *Batson* does not apply to challenges for cause. *State v. Gilbert*, 520 So.2d 1184, 1188 (La. App. 5th Cir. 1988); *State v. Darville*, 20-1135, p. 10 (La. App. 1 Cir. 10/18/21), 2021 WL 4844343. However, defendant contends that the State's use of peremptory challenges to strike the remaining potential African-American jurors from the panel was racially motivated.

Before we analyze defendant's arguments regarding each individual African-American juror, we first address defendant's assignment of error that the trial court "erred by not specifically ruling on whether the State provided race-neutral reasons." Defendant points to the following ruling denying his first *Batson* challenge in support of his argument: "At this time, I do find that the State has provided a valid reason or reasons for exercising its peremptory challenges, so the Batson challenge is denied." Defendant appears to complain that the trial court did not state the phrase "race-neutral" in its rulings. Defendant did not separately brief this assignment of error and fails to cite to any authority in support of his argument. To the contrary, *Batson* does not require a trial court to provide specific findings regarding proffered race-neutral reasons. *See Sparks*, 68 So.3d at 475. Further, after reviewing the record, it is apparent that the trial court applied the appropriate standards in its decision to deny defendant's *Batson* challenge. This assignment of error is without merit.

*Potential Juror Mary Lewis*

Defendant argues that the State's reasons for exercising its peremptory challenge against Ms. Lewis are invalid because the State simply re-urged the same grounds it argued to the trial court when it moved to challenge Ms. Lewis for

cause. Defendant argues that the trial court's denial of the State's reasons for requesting a challenge for cause against Ms. Lewis "canceled out" the State's ability to raise these same reasons as grounds for exercising a peremptory challenge. Defendant does not cite to any legal authority for this argument. Clearly, this argument is baseless as different standards apply when a trial court evaluates reasons provided for a challenge for cause and a peremptory challenge.[16] Furthermore, a race-neutral explanation for exercising a peremptory challenge does not need to rise to the level justifying the exercise of a challenge for cause. *State v. Green*, 94-887 (La. 5/22/95), 655 So.2d 272, 288.

As explained above, the State told the trial court that it exercised a peremptory challenge against Ms. Lewis because, in response to the prosecutor's questions, Ms. Lewis repeatedly stated that she could not judge or vote to convict defendant due to her religious beliefs. The prosecutor explained to Ms. Lewis that she was not asking her to judge the defendant, but rather to judge whether the State proved its case beyond a reasonable doubt. However, Ms. Lewis persisted in her position that she could not vote to convict. Later, defense counsel provided the same explanation and questions to Ms. Lewis and she changed her position by agreeing that she could judge the State's case and whether it had proven its case beyond a reasonable doubt.

The State initially moved to strike Ms. Lewis for cause due to her inconsistent responses to the same questions from the State and defendant. Defendant argued in response that Ms. Lewis was sufficiently rehabilitated. The trial court then called Ms. Lewis to the bench to conduct further questioning due to her inconsistent responses. When asked by the trial court whether she could vote to convict defendant in light of her religious beliefs, Ms. Lewis responded that it would bother her. The State then asked her if she would have trouble voting guilty

---

[16] The grounds for sustaining a challenge for cause are discussed in La. C.Cr.P. arts. 797 and 798.

because defendant would receive a life sentence, and Ms. Lewis again responded that it would bother her and agreed that it would weigh on her conscience to the extent that she would not want to vote guilty. However, Ms. Lewis again changed her position in response to further questioning by defense counsel:

**Mr. Thompson**: This is just making sure I understand. So once they've submitted their evidence, okay, and once the case is done, once we've given all our arguments, the Judge is going to tell you what the burden of proof is, he is going to read the law to you. Okay. And he's going to tell you that if you have found that they have done their job, that they've proven their case beyond a reasonable doubt, that you have to find him guilty if they prove their case. So can you follow the law and follow those instructions if the Court instructs you to do that?

**Juror No. 285 [Ms. Lewis]**: Yeah, I can. I can, you know, but it would be hard, you know.

**Mr. Thompson**: It's going to be hard. Obviously, any kind of decision like that is hard.

**Juror No. 285 [Ms. Lewis]**: Yeah.

**Ms. Beckner**: Is that going to sway your position is what we're concerned about. Is that going to be on your conscience and sway your decision one way or the other because you don't want someone to get a life sentence?

**Juror No. 285 [Ms. Lewis]**: Well, you know, I would have to see what the evidence is.

The State then moved again to excuse Ms. Lewis for cause "because she's given different answers both times," and expressed uncertainty as to whether Ms. Lewis could be fair and impartial. The trial court denied the State's challenge for cause finding that Ms. Lewis stated that she could follow the law. Later, when explaining the State's use of its peremptory challenge to strike Ms. Lewis, the prosecutor re-urged these same concerns that Ms. Lewis provided inconsistent

responses regarding her ability to judge and to return a guilty verdict involving a life sentence.

A juror's reservation about returning a guilty verdict due to religious beliefs provides sufficient, legitimate, race-neutral grounds for exercising a peremptory challenge. *See State v. Seals*, 09-1089 (La. App. 5 Cir. 12/29/11), 83 So.3d 285, 312-13, *writ denied*, 12-293 (La. 10/26/12), 99 So.3d 53, *cert. denied*, 569 U.S. 1031, 133 S.Ct. 2796, 186 L.Ed.2d 863 (2013); *State v. White,* 01-134 (La. App. 5 Cir. 7/30/01), 792 So.2d 146, 151-53, *writ denied*, 01-2439 (La. 9/13/02), 824 So.2d 1190; *State v. Kitts*, 17-777 (La. App. 1 Cir. 5/10/18), 250 So.3d 939, 962, *writ denied*, 18-872 (La. 1/28/20), 291 So.3d 1057. Similarly, reservations about convicting a defendant of a crime which carries a mandatory life sentence without parole provides valid race-neutral grounds to support a peremptory challenge. *Daniels*, 275 So.3d at 397.

Here, Ms. Lewis initially stated she could not judge defendant for religious reasons and also expressed concerns regarding the life sentence. As she was asked more questions, she indicated she could follow the law but also provided inconsistent responses. Considering the foregoing, we find the trial court was not clearly erroneous in denying defendant's *Batson* challenge.

*Potential Juror Charman Broome*

As explained above, Mr. Broome stated during *voir dire* that his son was incarcerated for possession of drugs in Jefferson Parish. The prosecutor also asked Mr. Broome if eyewitness testimony alone without DNA or fingerprint evidence would be enough for a conviction. Mr. Broome replied, "I mean, not necessarily, no." When asked why not, Mr. Broome replied that the witness might not be telling the truth and he would have to listen to all of the evidence. The prosecutor later asked if anyone felt like they had to hear from the defendant before they could deliberate. Mr. Broome explained that he would like to hear defendant's testimony

to understand his version of the facts. Defendant contends that these grounds do not constitute race-neutral reasons to exercise a peremptory challenge because Mr. Broome was rehabilitated on these issues and otherwise provided responses indicating that he was a well-qualified juror. As previously established, however, race-neutral reasons for exercising a peremptory challenge do not have to rise to the level of a challenge for cause.

Furthermore, this Court has found that a juror having a family member with a criminal record is a race-neutral explanation. *Chester*, 314 So.3d at 980; *State v. Odoms*, 01-1033 (La. App. 5 Cir. 3/26/02), 815 So.2d 224, 235, *writ denied*, 02-1185 (La. 11/22/02), 829 So.2d 1037. In *Florant*, 119 So.3d at 645, this Court found that the State provided a race-neutral reason when it struck a potential juror because she stated witness testimony alone would be insufficient for her to find guilt beyond a reasonable doubt and she would want to see additional evidence. This Court indicated that a prospective juror's holding the State to a higher burden of proof is a valid race-neutral reason for a peremptory strike. *See* also *State v. McElveen*, 10-172 (La. App. 4 Cir. 9/28/11), 73 So.3d 1033, *writs denied*, 11-2567, 11-2578 (La. 4/9/12), 85 So.3d 692, *cert. denied*, 568 U.S. 1163, 133 S.Ct. 1237, 185 L.Ed.2d 188 (2013) (Juror needing certain types of evidence such as DNA or fingerprint evidence to convict constitute race-neutral reasons).

The State provided race-neutral explanations that were specific, related to the case at bar and not inherently discriminatory. Considering these reasons along with the arguments raised by defendant, we find that the trial court was not clearly erroneous in concluding defendant did not carry his burden of proving discriminatory intent in the State's exclusion of Mr. Broome.

*Potential Juror Charlene Pastore*

During *voir dire*, Ms. Pastore stated that her nephew was murdered four years ago in Orleans Parish and no suspects were arrested. When initially asked if

this situation would affect her ability to be fair to either the State or defendant, Ms. Pastore responded, "It still hurts." When asked again by the State if she could be fair, Ms. Pastore stated, "I guess yeah" and eventually agreed that she could be fair after further discussion. Furthermore, Ms. Pastore initially indicated that she did not know if she could vote to convict defendant knowing that the charge required a life sentence. Finally, the State questioned jurors regarding their positions on self-defense as a defense to a murder charge. During questioning by the State, Ms. Pastore initially indicated that she believed a person was in imminent danger of harm and could act in self-defense if the other person had a gun in a holster and stated, "I'm going to kill you" during an argument. The State also raised this response as a reason for exercising its peremptory challenge.

Defendant argues in response that Ms. Pastore was clear she could put aside her personal experiences regarding her nephew and that this experience made her more likely to side with the State. Defendant also argues that this reason was a pretext for racial motivations because the State did not exercise a peremptory challenge against a white female, who stated that her child was held up at gunpoint and no one was ever arrested or prosecuted. Further, defendant asserts that the State misconstrued Ms. Pastore's responses regarding her position on self-defense.

As discussed above in our analysis of the State's peremptory challenge to Ms. Lewis, reservations about convicting a defendant of a crime which mandates a life sentence provides valid race-neutral grounds to support a peremptory challenge. *Daniels*, *supra*. In addition, courts have previously found the murder of a family member of a potential juror to be a race-neutral reason to excuse the potential juror. *See State v. Joseph*, 01-360 (La. App. 5 Cir. 10/17/01), 802 So.2d 735, 742, *writ denied,* 02-232 (La. 12/13/02), 831 So.2d 979. We do not find purposeful discrimination in the State's decision not to challenge the juror with a family member held up at gun point because this situation is different than a crime

involving the murder of a family member. Finally, the evidence indicated that the victim possessed a gun at the time of the shooting so the State's concern that Ms. Pastore would favor the defendant if he argued self-defense at trial was relevant to the case.

Accordingly, we find that the trial court was not clearly erroneous in concluding defendant did not carry his burden of proving discriminatory intent in the State's exclusion of Ms. Pastore.

*Potential Juror Tiffany Cook*

During *voir dire*, Ms. Cook indicated that her brother was convicted of the attempted murder of his wife in Texas 20 years ago. When asked if she thought that experience would prevent her from being fair in this case, Ms. Cook replied, "Not at all. Because if he did it, he was supposed to do the time."

Later in *voir dire*, the prosecutor addressed justifiable homicide and self-defense. After presenting several different scenarios, the following exchange occurred between the prosecutor and Ms. Cook:

| | |
|---|---|
| **Ms. Schneidau**: | Who here thinks that me just holding gun and speaking to you maybe in a way that you don't like is sufficient for you that you would be reasonable in believing you're in imminent danger of losing your life and that you had to kill me, it's necessary to kill me? |
| **Juror No. 134 [Ms. Cook]**: | (Indicating). |
| **Ms. Schneidau**: | Yes, Ms. Cook, you think that? |
| **Juror No. 134 [Ms. Cook]**: | Yes. If you were responsible, you wouldn't talk to me with a gun out. And I don't -- I mean, you pull the trigger so fast, I'm not going to stand there and wait for you to decide -- I mean, by the time I realize whether or not I'm in danger, I'm dead. If you are responsible with your weapon, you will keep it in the holster; you will not talk to me upset with a gun out. So, yeah, I shoot to protect myself. |
| **Ms. Schneidau:** | So it's killed or be killed? |

**Juror No. 134**
**[Ms. Cook]:**        Basically at that time.

After defendant raised a *Batson* challenge as to Ms. Cook, the prosecutor explained that it exercised the challenge because Ms. Cook has a brother who was convicted of second degree murder and Ms. Cook believed that holding a gun is a threat.[17]  On appeal, defendant argues that Ms. Cook was a qualified juror and the State's reasons were not valid.  Defendant further argues that the State's racial motives are demonstrated by the fact that the State did not challenge another juror who stated that she had three cousins who were convicted and one cousin killed by a JPSO deputy.

As previously provided, this Court has found that a juror having a family member with a criminal record is a race-neutral explanation.  *Chester*, *supra*. Further, the State's concern regarding Ms. Cook's position on self-defense was a relevant and valid concern considering the facts of the case.  Finally, we do not find the State's decision not to strike the other juror with convicted family members is evidence of purposeful discrimination.  The fact that a prosecutor excuses one person with a particular characteristic and not another similarly situated person does not in itself show that the prosecutor's explanation was a mere pretext for discrimination. The accepted juror may have exhibited traits which the prosecutor could have reasonably believed would make him desirable as a juror. *State v. Turner*, 16-1841 (La. 12/5/18), 263 So.3d 337, 379, *cert. denied*, -- U.S. --, 140 S.Ct. 555, 205 L.Ed.2d 355 (2019).  The other juror that defendant compares to Ms. Cook also indicated that she was currently a sitting Jefferson Parish judge.

Accordingly, we find that the trial court was not clearly erroneous by denying defendant's *Batson* challenges.

---

[17] The trial court corrected the State and recognized that Ms. Cook's brother was convicted of attempted second degree murder.

In his final *pro se* assignment of error, defendant argues that the trial court erred by allowing the trial to proceed without a fair cross-section of Jefferson Parish's population. The State argues that defendant waived any objection to his claim regarding the racial composition of the petit jury venire because he did not file a motion to quash with the trial court.

The proper procedural vehicle for alleging that a jury venire was improperly drawn, selected, or constituted is a motion to quash. La. C.Cr.P. art. 532(9); *State v. Patton*, 22-112 (La. App. 5 Cir. 12/21/22), 355 So.3d 156, 178. A motion to quash based on the ground that the jury venire was improperly selected should be filed in writing prior to the beginning of jury selection. *Id.*; *State v. Holliday*, 17-1921 (La. 1/29/20), 340 So.3d 649, 691, *cert. denied*, -- U.S.--, 141 S.Ct. 1271, 209 L.Ed.2d 10 (2021).

Defendant did not file a motion to quash in the trial court alleging that the jury venire was improperly drawn or selected. Courts of Appeal will review only issues that were submitted to the trial court. Uniform Rules-Courts of Appeal, Rule 1-3. Accordingly, this assignment of error is without merit.

**ERRORS PATENT DISCUSSION**

The record was reviewed for errors patent, according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5 Cir. 1990). Upon review, the following errors patent require corrective action.

A review of the minute entry and transcript of the proceedings on July 29, 2022, reveals that the trial judge did not advise defendant of the prescriptive period for filing post-conviction relief at his sentencing. If the trial court fails to advise pursuant to La. C.Cr.P. art. 930.8, the appellate court may correct this error by informing defendant of the applicable prescriptive period for post-conviction relief by means of its opinion. *See State v. Perez*, 17-119 (La. App. 5 Cir. 8/30/17), 227

So.3d 864, 870.  Therefore, we advise defendant that no application for post-conviction relief, including applications that seek an out-of-time appeal, shall be considered if filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. arts. 914 or 922.

The record also reveals a conflict between the transcript and the State of Louisiana Uniform Sentencing Commitment Order (UCO), which reflects the incorrect date of offenses.  The UCO reflects the date for all of the offenses as "10/22/2020."  However, the record reflects that October 21, 2020 is the correct date for the offenses.  We remand the matter for correction of the date and direct the Clerk of Court to transmit the corrected UCO to the officer in charge of the institution to which defendant has been sentenced, as well as to the legal department of the Louisiana Department of Public Safety and Corrections.

Accordingly, defendant's convictions and sentences are affirmed that this matter is remanded for correction consistent with this opinion.

**AFFIRMED; REMANDED WITH INSTRUCTIONS**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
CORNELIUS E. REGAN, PRO TEM

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **AUGUST 18, 2023** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 22-KA-536

### E-NOTIFIED
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE R. CHRISTOPHER COX, III (DISTRICT JUDGE)
JULIET L. CLARK (APPELLEE)          THOMAS J. BUTLER (APPELLEE)          HOLLI A. HERRLE-CASTILLO
                                                                        (APPELLANT)

### MAILED
JUSTIN A. HUTCHINSON #632758          HONORABLE PAUL D. CONNICK, JR.
(APPELLANT)                           (APPELLEE)
DAVID WADE CORRECTIONAL CENTER        DISTRICT ATTORNEY
670 BELL HILL ROAD                    TWENTY-FOURTH JUDICIAL DISTRICT
HOMER, LA 71040                       200 DERBIGNY STREET
                                      GRETNA, LA 70053